SOMMERS & SCHWARTZ LLP
ANDREW H. SCHWARTZ (SBN 100210)
  *ahs@sommersschwartz.com*
FRANK F. SOMMERS, IV (SBN 109012)
  *ffs@sommersschwartz.com*
550 California Street
Sacramento Tower, Suite 700
San Francisco, California 94104
Telephone: (415) 955-0925
Facsimile:  (415) 955-0927

Attorneys for Plaintiff and Counterdefendant
INTELLIGRAPHICS, INC.

MAYER, BROWN, ROWE & MAW LLP
MICHAEL A. MOLANO (SBN 171057)
  *mmolano@mayerbrownrowe.com*
SHIRISH GUPTA (SBN 205584)
  *sgupta@mayerbrownrowe.com*
JOSHUA M. MASUR (SBN 203510)
  *jmasur@mayerbrownrowe.com*
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, Califonia 94306-2112
Telephone: (650) 331-2000
Facsimile:  (650) 331-2060

Attorneys for Defendant and Counterclaimant
MARVELL SEMICONDUCTOR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| INTELLIGRAPHICS, INC.,<br><br>              *Plaintiff and*<br>              *Counterdefendant,*<br><br>    *v.*<br><br>MARVELL SEMICONDUCTOR, INC.,<br><br>              *Defendant and*<br>              *Counterclaimant.* | Case No. C-07-2499 JCS<br><br>**[DRAFT] JOINT CASE MANAGEMENT STATEMENT**<br><br>Date: Friday, August 24, 2007<br>Time: 1:30 p.m.<br>Courtroom A, 15th Floor |

1   Plaintiff and Counterdefendant INTELLIGRAPHICS, INC. ("Intelligraphics" or

2   "Plaintiff") and Defendant and Counterclaimant MARVELL SEMICONDUCTOR, INC.

3   ("Marvell" or "Defendant") hereby jointly submit this Case Management Statement in

4   preparation for the August 24, 2007 Initial Case Management Conference.

5   1.    **JURISDICTION AND SERVICE**

6        (a)    **Subject matter jurisdiction:**  This court has subject matter jurisdiction over the

7   Sixth Cause of Action pursuant to 17 U.S.C. § 501 and 28 U.S.C. §§ 1331 and 1338(a) for the

8   claims arising under the laws of the United States.  This Court has subject matter jurisdiction

9   over the First, Second, Third, Fourth, Fifth and Seventh Causes of Action pursuant to 28 U.S.C.

10  § 1332(a) in that the matter in controversy exceeds the sum or value of $75,000 exclusive of

11  interest and costs and is between citizens of different States.  In addition, this court has subject

12  matter jurisdiction over the First, Second, Third, Fourth, Fifth and Seventh Causes of Action

13  pursuant to 28 U.S.C. § 1367 (a) and the principles of supplemental jurisdiction.  This Court has

14  subject matter jurisdiction over all Counterclaims herein pursuant to 28 U.S.C. § 1367(a) and the

15  principles of supplemental jurisdiction, 28 U.S.C. § 1332(a), in that the matter in controversy

16  exceeds the sum or value of $75,000 exclusive of interest and costs and is between citizens of

17  different States, and 28 U.S.C. § 2201(a), to the extent that one or more counterclaims request

18  declaratory judgment.

19       (b)    **Personal jurisdiction and venue:**  No issues exist.

20       (c)    **Service of process:**  All parties have been served.

21  2.    **FACTS**

22       Intelligraphics is a device driver and systems level software development company with

23  headquarters in Dallas Texas. It writes device driver software for, among other things, Wireless

24  Local Area Network (WLAN) communications chips which may be used to connect computers

25  to the internet via wireless Access Points ("AP").  Marvell is a global semiconductor provider of

26  high-performance analog, mixed-signal, digital signal processing and embedded microprocessor

27  integrated circuits, headquartered in Santa Clara, California.

28

1   The parties have cooperated in creating this statement, but were unable to agree as to the

2   content or extent of the factual presentation, and have therefore produced two factual sections.

3   While requiring additional reading, comparison of the differences between the two may

4   illuminate potential issues regarding the proper scope of discovery, identity of witnesses, length

5   of trial, and other matters.

6       (a)    **Plaintiff's Statement of Facts**

7           (i)    ***Background and Glossary***

8   As the chip hardware improves, so does the programming needed to take advantage of

9   new features or capacities. Various industry standards have developed for the communications

10  protocols used by the hardware in both the chips and the access points that communicate with

11  them. When Marvell and Intelligraphics signed the SDLA in 2003, the most widely-adopted

12  communication protocol was "802.11," which had been created by the Institute of Electrical and

13  Electronics Engineers (IEEE) and termed "IEEE 802.11." This protocol, originally developed in

14  1997, had since been updated and augmented, with new versions given a letter designation *i.e.*

15  802.11(a), (b) etc.

16  The various projects requested by Marvell during the period 2003-2006 either involved

17  Intelligraphics upgrading or changing its pre-existing 802.11 software to comply with the new

18  versions of 802.11 – (b), (g), (e) etc then on the market, or involved altering the software so that

19  it would operate under a different computer operating system ("porting").

20  Communications chip software for 802.11-compliant devices comprises three main

21  groups of programs- the firmware, the driver and the supplicant. These distinctions are important

22  for understanding the scope of the various projects commissioned by Marvell herein.

23  "Firmware" is software that resides on the chip and handles traffic between the hardware

24  functions performed by the chip and the driver software.  The "driver" is software installed on

25  the host device (such as a PC or cell phone) in which the chip is installed, and which handles

26  communication between the firmware, the operating system (such as Microsoft Windows) and

27  the supplicant.  The "supplicant" is a hardware-independent software application installed on the

28

1   host device that, among other things, handles the network security authentication routines needed

2   for the host device to gain access to the network.

3          "Roaming" describes how a wireless device in motion moves its connection from one AP

4   to another.  Roaming software seeks to connect the host device to the AP that provides the best

5   connection quality for that location – much like a cell phone switches cell towers while in

6   motion. The way a wireless device and its software handles roaming depends on the degree of

7   mobility required by the designer. For example, a laptop moved from home to the office needs to

8   sample the available access points detected once it is turned on, but may thereafter not retest the

9   signal strengths it encounters very often, on the assumption that it will not be moved until it is

10  turned off. By contrast, a cell phone needs to sample the access points much more frequently,

11  given that it may be traveling at a high rate of speed while in use.

12         "CCX" (Cisco Client Extensions) is a Cisco Systems proprietary extension of the 802.11

13  standard for use with Cisco-manufactured wireless access points. CCX's stated purpose is to

14  enhance security, availability, mobility and reliability. One benefit of CCX is that it will more

15  flexibly distribute traffic between access points. For example a CCX enabled device attempting

16  to log on to a given CCX enabled access point may be told to go elsewhere for load balancing

17  purposes, even though the given access point is in fact the strongest signal detected by the client

18  communications chip at the time. Absent specific programming to handle CCX-specific

19  instructions, a chip attempting to establish contact with a Cisco access point may encounter

20  difficulties.

21                  (ii)    ***The Original 2003 Software Development and License Agreement***

22         In 2003, Marvell hired Intelligraphics to adapt Intelligraphics's basic 802.11(b) and (g)

23  software to run on a Marvell 88W8510 chipset. The parties entered into a Software Development

24  and Licensing Agreement ("SDLA"), which had Exhibits that described the scope of work and

25  the applicable specifications. The 2003 engagement was a fixed price contract, with development

26  and payment milestones defined during contract negotiations:

27              In consideration of Intelligraphics' (sic) development of the
                Custom Software pursuant to Section 2.1 hereof, Marvell agrees to
28

> pay Intelligraphics a development fee (the "Development Fee") <u>in the amounts set forth in the Development Schedule</u> and upon acceptance of each Milestone Deliverable, including the Custom Software, pursuant to a Statement of Acceptance in accordance with Section 3.2 hereof by Marvell. (emphasis added.)

The 2003 contract called for Intelligraphics both to convert its software to run on the Marvell chipset, and to incorporate certain CCX features into that software. The contract granted Marvell a preliminary license to Intelligraphics's "Basic Code," and then set out the following language about when transfer of intellectual property rights occurred:

> At such time as MARVELL has paid the applicable Development Fee for each Milestone Deliverable delivered by Intelligraphics and accepted by MARVELL, then MARVELL shall assume ownership of such Milestone Deliverable and all Intellectual Property Rights therein.

After Intelligraphics started work on the CCX portion of the 2003 contract, however, Cisco objected that Marvell's CCX license did not permit Intelligraphics to have possession of either the CCX software or any CCX-based development tools provided by Marvell. After an attempt to work around this problem, work on the CCX portion of the contract was terminated. (Intelligraphics was subsequently told that Marvell had completed the CCX-related work on the 802.11 driver modules.) Intelligraphics completed the rest of the work called out under the specifications, as modified by Marvell during the work. Marvell failed to pay Intelligraphics until Intelligraphics filed suit in Dallas, whereupon Marvell paid the amounts agreed upon in the SDLA.

(iii)    ***The 2004 802.11 Driver Upgrades***

In February 2004, Marvell approached Intelligraphics and requested that it create software for Marvell's "Libertas" chips, which were part of the 88W8510 chipset family, to comply with the 802.11(i) and QoS 802.11(e) specifications. The parties executed Amendment 1 to the SDLA. Amendment 1 had Attachments 1 and 2, which were defined as becoming Exhibits H and I to the SDLA.  This work involved upgrading the driver software to meet the listed 802.11 specifications. Intelligraphics performed this work and was paid the fixed price on the schedule set out in the contract.

1    In September 2004, Marvell and Intelligraphics entered into Amendment 2 to the SDLA,

2    which defined new scope of work documents, Attachment 3 and 4, which became Exhibits J and

3    K to the SDLA. Under those Attachments Intelligraphics agreed to upgrade the driver software

4    to incorporate the then-most-current specifications for WME and WSM (versions of 802.11(e)

5    specifications developed by the Wi-Fi Alliance) into the 802.11(e) and (i) compliant driver

6    modules. Intelligraphics performed and was paid for this work.

7                   (iv)    ***The 2006 Projects in Issue Here***

8    In mid 2006, Intelligraphics was again asked by Marvell to perform additional work on

9    the software that supported the Libertas chipset, as well as to port the driver to another operating

10   system. By August 2006 both parties had executed Amendment 3 to the SDLA, which had two

11   attachments, 1 and 2.  Attachment 1 is titled "Hourly WLAN Vista Driver Development."

12   Attachment 2 is titled "Hourly CCXv4 Funk Supplicant Development."  The two attachments are

13   defined as Exhibits L and M to the SDLA.  Work on the projects started in June 2006.  Both

14   Attachments had new, identical language regarding payment:

15           8. PAYMENTS

16                   (a)    <u>Development Fee</u>.  Intelligraphics will perform all
         services and develop all Milestone Deliverables , including the
17       Custom Software, described herein on a time and materials basis at
         the rate of $135 U.S. Dollars per development man hour, subject to
18       Section 8(b) below. At the end of each day Intelligraphics
         engineers will report to Marvell all hours worked with a brief
19       summary of the work completed for that day.

20                   (b)    All services provided by Intelligraphics under this
         Statement of Work (Exhibit M) and the Statement of Work that is
21       attached as Exhibit L to the Agreement , are subject to a
         cumulative cap of two hundred fifty thousand U.S. Dollars (the
22       "Payment Cap"). Unless otherwise mutually agreed upon by the
         parties in writing, in no event shall the fees payable by Marvell to
23       Intelligraphics  exceed the Payment Cap for any and all services
         rendered by Intelligraphics under this Statement of Work (Exhibit
24       M) and the Statement of Work that is attached as Exhibit L to the
         Agreement.[1]

25

26

27

---

[1] The only difference between the two Attachments was the reversal of the Exhibit L and M references from one to
28   the other in order to properly call out the other attachment

1    The parties disagree about how many separate projects Marvell initiated in 2006 and

2  whether all are covered by Amendment 3. Plaintiffs contend that Marvell requested four different

3  projects in connection with the 802.11 upgrades. The first was VISTA, the second work on the

4  CCXv4 Supplicant, the third Advanced Roaming, and the fourth the porting of the driver to the

5  VRTX operating system, (the "Motorola project.") Intelligraphics contends and Marvell denies

6  that the only projects intended to be documented by Amendment 3 when it was executed by the

7  parties was the VISTA and CCXv4 Supplicant agreement. Intelligraphics contends, and Marvell

8  denies that the Advanced Roaming project was subject to the $250,000 cap set out in

9  Attachments 1 and 2 to Amendment 3.

10    Intelligraphics contends says that the Advanced Roaming project initially involved

11  upgrading the roaming functions to make laptop chips perform more like cellphone chips- *i.e.*

12  check more often for movement. Marvell contends that Advanced Roaming is part of the CCX

13  Supplicant project. Intelligraphics contends that Advanced Roaming was entirely separate from

14  the CCX Supplicant project, but that since the CCX Supplicant work had its own roaming

15  specifications, major modifications in the Advanced Roaming project were required by Marvell.

16  Both parties agree that the Vista project was only worked on briefly, then stopped. Marvell paid

17  the hourly amounts billed on the Vista project.

18    Separate and apart from the language quoted above about renegotiation of the payment

19  amounts due, Intelligraphics contends, and Marvell denies, that Marvell agreed that the Payment

20  language of paragraph 8 allowed Intelligraphics to stop work when the cap was reached –

21  whether or not all the work required to meet the specifications had been completed – and turn

22  over the appropriate software and copyrights to Marvell, which could finish the work itself if it

23  did not want to increase the authorized expenditure level. Marvell contends - and Intelligraphics

24  denies - that Intelligraphics promised to complete all the work called for under Amendment 3 for

25  $250,000. Marvell also contends, and Intelligraphics denies, that all of the 2006 802.11 work

26  other than the Vista and Motorola projects, however labeled, was covered by Amendment 3 and

27  hence the cap.

28

1    Work on the Motorola project started in August 2006 and continued until March 2007. In

2  March 2007, Marvell created a document titled "Amendment 4" that it contends covers the

3  Motorola project, and which, though never signed, it contends was 'executed by performance' by

4  the parties. Intelligraphics denies this contention.

5    There are significant disputes between the parties concerning the changes in the scope of

6  work that did or did not occur during the summer and fall of 2006. Intelligraphics contends that

7  the "Hourly CCXv4 Funk Supplicant" work originally did not involve any work on the driver

8  portions of the software, all of which was being performed by Marvell's Santa Clara and German

9  software engineering group and other outside consultants. Later, however, Marvell requested that

10 Intelligraphics perform work on the CCX roaming portion of the driver software. There are also

11 disputes between the parties as to whether Marvell had created problems with the CCX driver

12 code by its simultaneous work on the CCX driver software, which problems Intelligraphics had

13 to debug in order to accomplish its own work.

14   In the fall of 2006, Intelligraphics contends that it informed Marvell that the $250,000

15 payment limit would be exceeded if the work were to continue, and Marvell stated that

16 authorizations for additional funds would be secured in connection with the parties discussions

17 as to how much additional work would be needed to complete the Advanced Roaming software

18 and what final delivery schedules would be required. Marvell requested that Intelligraphics

19 continue work on the projects before such negotiations were finalized and such authorizations

20 were received. Intelligraphics informed Marvell that the cost to complete all work that Marvell

21 had requested by the fall of 2006 would cost close to $500,000. Thereafter, Intelligraphics turned

22 over what it describes as the Advanced Roaming code.  Intelligraphics contends, and Marvell

23 denies, that this Advanced Roaming code materially met all contract requirements, to the extent

24 that Marvell's actions permitted them to be met.

25   After discussions that lasted until approximately March 2007, Intelligraphics contends

26 that Marvell refused to pay any sums over $250,000 for the other work and indeed contended

27 that no contract existed for such work such that while Intelligraphics was required to complete

28

1   the work, Marvel had no obligation to make any further payments whatsoever. As of the date that

2   litigation was instituted by Intelligraphics, Marvell had only paid approximately $205,000 for the

3   work on the 2006 802.11 under Amendment 3.

4          Marvell had paid Intelligraphics' invoices for the Motorola project as they were received

5   by issuing purchase orders against which it paid the invoices. In the Fall of 2006, Marvell

6   informed Intelligraphics that the Motorola project fees could not exceed $100,000.

7   Intelligraphics objected and, after some discussion, provided an estimate of its cost to complete

8   of approximately $126,000. Intelligraphics delivered the Motorola project software on January

9   26, 2007 and continued to support the Marvell team until March, 2007, after having been paid

10  approximately $103,000.  Marvell did not pay or offer to pay without conditions the remaining

11  sums due on the Motorola project until after Intelligraphics sued, which Intelligraphics contends,

12  and Marvel denies, also occurred only after Marvell had materially breached the parties' contract

13  for the Amended Roaming work.  Finally, Intelligraphics contends, and Marvell denies, that

14  Intelligraphics properly registered its copyright to the software it developed on the Motorola

15  project, which was to become the property of Marvell only after Marvell paid all amounts due

16  and owing, on a time and material basis, for such software.

17                      (v)      ***Post Litigation Events***

18         After litigation was instituted and this suit filed in California, Marvell sent counsel for

19  Intelligraphics a CD which it said contained all code written under Amendment 3, stated that it

20  had not kept any copies (other than a copy in counsel's possession) and notified Intelligraphics

21  that it was rescinding the contract for that work, demanding in consequence the return of the

22  $201,555.88 paid for that work. In addition, in June, 2007, Marvell issued what it described as a

23  purchase order covering the outstanding amounts claimed in the suit for the Motorola software as

24  defined in Attachment 4. In July 2007 it tendered to counsel a check for the amount for the

25  unpaid Motorola work set out in the complaint, and demanded the assignment of all copyrights to

26  the software pursuant to the SDLA. Intelligraphics rejected that legal position because of the

27  legal issues identified below.

28

1    (b)    **Defendant's Statement of Facts**

2    This dispute arises out of the parties' agreement or agreements under which

3    Intelligraphics developed certain network client software for use with certain Marvell chips that

4    comply with the widely-used IEEE 802.11 wireless networking protocol and variants thereof.

5    (i)    ***Amendment 3, including "Advanced Roaming"***

6    In 2003, Marvell hired Intelligraphics to write 802.11(b) and (g) drivers for Marvell's

7    88W8510 chipset, and the parties entered a Software Development and Licensing Agreement

8    ("SDLA").  Amendments 1 and 2 to the SDLA governed Intelligraphics' additional work on

9    drivers for the 88W8510 chipset family.

10    In mid-2006, the parties executed Amendment 3 to the SDLA, which had two

11    attachments, titled "Hourly WLAN Vista Driver Development" and "Hourly CCXv4 Funk

12    Supplicant Development," respectively.  The attachments to Amendment 3 provided, *inter alia*,

13    that:

14    > Intelligraphics will perform all services … on a time and materials
15    > basis at the rate of $135 U.S. Dollars per development man hour,…
> subject to a cumulative cap of two hundred fifty thousand U.S.
16    > Dollars (the "Payment Cap"). Unless otherwise mutually agreed
> upon by the parties in writing, in no event shall the fees payable by
> Marvell to Intelligraphics exceed the Payment Cap for any and all
17    > services rendered by Intelligraphics.

18    Marvell contends that Intelligraphics' work on "Advanced Roaming"[2] software delivered

19    by Intelligraphics in the Fall of 2006 was covered by Amendment 3, either because it was part of

20    CCX or because it replaced the Vista portion of the work, which was terminated by agreement of

21    the parties before Intelligraphics performed substantial work.  Therefore, Marvell contends that

22    the Advanced Roaming code is subject to the cumulative $250,000 Payment Cap set forth in

23    Amendment 3.

24    Marvell contends that the cumulative Payment Cap was expressly intended to provide a

25    sufficient "cushion" that all work thereunder could be completed as promised.  Intelligraphics

26    contends that it was allowed to stop work when the cap was reached, and had no obligation to

27    ───────────────
[2] When "roaming," a wireless device switches its connection from one "access point" to another "access point"
28    depending on factors such as the distance and strength of the wireless signals.

- 9 -

1  complete the work set forth therein within the budget or on time, notwithstanding the language of

2  Amendment 3.

3          Based on Intelligraphics' complaint, in which it contends that it knew at the time

4  Amendment 3 was executed that its obligations could not be performed within the cumulative

5  $250,000 Payment Cap, Marvell asserts that Intelligraphics' execution of Amendment 3 with

6  such knowledge constituted fraud.  Intelligraphics also contends, and Marvell denies, that

7  Marvell believed that Intelligraphics' obligations could not be performed under the Payment

8  Cap.

9          In the Fall of 2006, Intelligraphics informed Marvell that it would not complete the work

10  under Amendment 3 within the $250,000 Payment Cap.  Although Amendment 3 unambiguously

11  requires that, "[u]nless otherwise mutually agreed upon by the parties in writing, in no event

12  shall the fees payable by Marvell to Intelligraphics exceed the Payment Cap for any and all

13  services rendered by Intelligraphics," there is no dispute that no such writing ever was executed.

14  Nonetheless, Intelligraphics contends, and Marvell denies, that Marvell orally agreed to exceed

15  the $250,000 cap, or to obtain authorization to do so.  Marvell further contends that even if any

16  such oral agreement ever were made – which it was not – Amendment 3 would render it void.

17          Intelligraphics delivered the code for the Advanced Roaming portion of CCX to Marvell.

18  That Advanced Roaming code was the only portion of the CCX code that Intelligraphics ever

19  delivered to Marvell under Amendment 3.  Marvell contends that Intelligraphics failed ever to

20  follow the delivery procedures set forth in the SDLA, as amended.

21          In late February 2007, Intelligraphics permitted Marvell engineers to inspect the

22  incomplete and nonfunctional CCX code as it then existed.  As provided by the SDLA, Marvell

23  delivered a list of errors found during that inspection to Intelligraphics, but Intelligraphics never

24  attempted to cure those errors, or otherwise responded to the statement of errors.  Marvell

25  contends that, under the express terms of the SDLA, that failure constituted a material breach.

26          After this litigation commenced, Marvell returned the code for the Advanced Roaming

27  portion of CCX to counsel for Intelligraphics, and certified that other than a copy retained by

28

1  counsel for purposes of this litigation, it had destroyed all copies of that code it ever has

2  possessed.

3      Marvell also contends, and Intelligraphics denies, that Intelligraphics also has materially

4  breached other provisions of the SDLA, as set forth in the sealed version of Marvell's

5  counterclaims.

6              (ii)      *The Motorola VRTX Port*

7      Pursuant to agreement of the parties, from about August 2006 through about March 2007,

8  Intelligraphics "ported," or translated, a Marvell 802.11n Windows XP driver to a Motorola

9  platform running the VRTX real-time operating system.  Although the parties never signed an

10  amendment to the SDLA to cover the Motorola VRTX Port, the parties exchanged drafts of an

11  Amendment 4 that was intended to do so.  Marvell contends, and Intelligraphics denies, that the

12  parties accepted the draft Amendment 4 by performing their respective obligations thereunder.

13  Marvell informed Intelligraphics that the Motorola VRTX Port fees could not exceed $100,000

14  and paid Intelligraphics's invoices for the Motorola VRTX Port as they were received by issuing

15  purchase orders against which it paid the invoices.

16      Intelligraphics invoiced Marvell for a total of approximately $100,000, which amount

17  Marvell had paid in full prior to the inception of litigation.  However, Intelligraphics' complaint

18  asserted that Intelligraphics was due an additional $22,273.98 for its work on the Motorola

19  VRTX Port.  Thereafter, Marvell first issued a purchase order, and then a check, for the

20  additional $22,273.98 that the Complaint alleged was unpaid.  Intelligraphics has rejected that

21  check, and apparently contends that Marvell has not fulfilled its relevant obligations to

22  Intelligraphics.  To date, however, Intelligraphics has not identified any purported obligation

23  related to the Motorola VRTX Port that Marvell has failed to fulfill.

24      Although Intelligraphics' complaint admits that the Motorola VRTX Port is merely a

25  derivative of Marvell's own software, Intelligraphics filed the copyright registration in its own

26  name.  According to the Copyright Office database, Intelligraphics did not limit its registration to

27  the new matter it allegedly added, but claimed registration in the entire Motorola VRTX Port.

28

3.     **LEGAL ISSUES**

(a)     **Plaintiff's Statement of Legal Issues**

1.     Whether Marvell materially breached its contract with Intelligraphics, in connection with the development of the CCX Roaming and Advanced Roaming software by:

(a) refusing to pay the full amount of the "development fee," on a time and materials basis;

(b) refusing to pay $250,000 for this software development unless Intelligraphics agreed to complete substantial additional work that Intelligraphics contends was made necessary by Marvell change orders; and,

(c) claiming – during negotiations when Intelligraphics' time and material billings reached $250,000 – that Intelligraphics did not have any binding contract for development of the Advanced Roaming Code, so that Marvell could walk away without paying anything further for such software development while Intelligraphics remained obligated to complete the development.

2.     If Marvell did materially breach the contract, what damages are recoverable by Intelligraphics?

3.     Whether Intelligraphics materially breached its contract for Advanced Roaming development by failing to create acceptable software or by failing to complete all work for $250,000, and, if so, the damages recoverable by Marvell for that breach.

4.     Whether the agreements of the parties in Amendment 3 contemplated a "cap" of $250,000, under which Intelligraphics was obligated to perform all the work called out in the specifications for that Amendment under the cap, or whether Amendment 3 was an hourly contract for time and materials, allowing Intelligraphics to either stop work at the end of the agreed amount and deliver its work product and intellectual property rights therein, or to renegotiate for additional sums if Marvell wished it to continue.

5.      To what extent does the SDLA, Amendment 3 and the developmental fee definition of Attachments 1 and 2 govern all of the projects undertaken by Intelligraphics for Marvell under the SDLA in 2006?

6.      Whether –  because Marvell refused to pay the amounts due, as "developmental fees" for the CCX Roaming and Advanced Roaming software development –  Marvell never met the SDLA's requirement for obtaining copyrights to the subject software.

7.      Whether Marvell owes Intelligraphics over $340,000 for breach of contract.

8.      Whether Amendment 3 was effectively and timely rescinded by Marvell and, if so, what the obligations did Intelligraphics have thereafter.

9.      Whether Marvell thereafter infringed upon Intelligraphics' software on its Advanced Roaming software through unauthorized use.

10.      Whether the parties contemplated that the Motorola code would be developed by Intelligraphics on a time and materials basis, without any fixed price, and whether Marvell's unilateral attempt to impose a $100,000 fixed price on that work constituted a breach of the parties' agreement.

11.      Whether the payment and copyright terms governing Intelligraphics's work on the Motorola code was governed by: (a) a contract based on the unexecuted Amendment 4, (b) an oral contract; (c) an implied contract based on the past contractual terms and course of conduct of the parties, or (d) *quantum meruit*.

12.      If Marvell materially breached its contract with Intelligraphics for any of the reasons set out in issue number one, was Intelligraphics excused from any further obligation with regard to the Motorola code –  including any obligation to transfer the copyright for that code to Marvel.

13.      If Marvell did not breach any contractual obligation related to the contract to develop the Motorola software, is Intelligraphics now obligated to transfer its copyright in that software to Marvel?

14.      Whether Marvell is liable for either or both of two intentional frauds:

1   (a) fraud in the inducement in telling Intelligraphics that the payment

2   provisions of Amendment 3 and its Attachments meant that the $250,000 "cap"

3   was a limit on the hourly work that, when reached, required Intelligraphics either

4   to stop work and turn over its work to date, along with the intellectual property

5   rights therein, or secure additional payment authorizations from Marvell; and,

6   (b) fraud in inducing Intelligraphics to continue software development

7   work once the "cap" was reached through Marvel's representation that it would in

8   fact pay all amounts over $250,000 incurred by Intelligraphics to finish the

9   projects requested by Marvell.

10   15.   If Marvell is liable for fraud, what are the recoverable damages therefore?

11   16.   Whether, if Marvell is liable for either fraud described in issue number 11 above,

12   Intelligraphics was excused from any further obligations with regard to the development of the

13   Motorola code – including the transmittal of copyrights from Intelligraphics to Marvell related

14   thereto.

15   17.   Whether Intelligraphics is liable for fraud because it agreed to complete the work

16   contemplated by Amendment 3 for $250,000 at a time that Intelligraphics knew that the work

17   could not be completed for that price?  If so, what are the recoverable damages for such fraud?

18   18.   Assuming that Marvell never properly obtained Intelligraphics's copyrights under

19   the  SDLA and the amendments thereto, whether Marvell has infringed upon Intelligraphics's

20   copyrights on the Motorola code through unauthorized use in chips manufactured for Motorola

21   or others?

22   19.   If Marvell is found to have infringed upon Intelligraphics's copyrights, the extent

23   to which Intelligraphics may be awarded damages based on that part of the profit Marvell has

24   obtained through such use that is reasonably related to Intelligraphics's software?

25   20.   Whether – if Marvell has infringed upon Intelligraphics's software – its

26   infringement was willful, requiring an award of attorneys fees to Intelligraphics and negating

27

28

1    Marvel's right to use overhead to offset the profits it received through unauthorized use of

2    Intelligraphics's software.

3        21.    Whether Intelligraphics or Marvell are liable for punitive damages for fraud.

4        (b)    **Defendant's Statement of Legal Issues**

5        Defendant submits that the primary disputed legal issues regarding Amendment 3,

6    including Advanced Roaming, include:

7        o    Whether Amendment 3, including its Payment Cap, binds the parties, including

8            whether such Payment Cap was waived by alleged oral agreement despite express

9            contractual language prohibiting oral modification;

10       o    Whether development of Advanced Roaming was governed by Amendment 3 or

11           by an implied contract, and if by implied contract, the terms thereof;

12       o    Whether Intelligraphics fraudulently induced Marvell to enter Amendment 3 by

13           agreeing to the Payment Cap despite its alleged knowledge that it could not

14           perform thereunder;

15       o    Whether Intelligraphics' fraud entitled Marvell to rescind Amendment 3, and if

16           so, whether Marvell's restoration of all consideration furnished by Intelligraphics

17           thereunder effected rescission;

18       o    Whether Intelligraphics breached Amendment 3 and/or the SDLA by, *inter alia*:

19           o    Failing ever to deliver the contracted software, let alone to do so on time and

20               within budget;

21           o    Failing to follow the delivery procedures set forth in the SDLA;

22           o    Failing to cure the errors identified in the inspected code;

23           o    Violating the confidentiality provision of the SDLA;

24           o    Registering the copyright in the Advanced Roaming code in its own name;

25               and

26           o    Filing suit in Texas despite the forum selection requirements of the SDLA;

27       o    Whether Intelligraphics' breaches excused any alleged actions by Marvell;

28

1        o  Whether Intelligraphics' damages, if any, are limited or eliminated by, *inter alia*,

2           the limitation of liability clause of the SDLA or the costs avoided by

3           Intelligraphics nonperformance; and

4        o  Whether Intelligraphics' purported copyright in the Advanced Roaming code is

5           valid, and if so, whether Marvell has made any unauthorized copy, derivative

6           work, or distribution that infringes such copyright.

7        Defendant submits that the primary disputed legal issues regarding the Motorola VRTX

8 Port include:

9        o  Whether development of the port is governed by Amendment 4 or an implied

10           contract, and if by implied contract, the terms thereof;

11        o  Whether Marvell has completed performance by payment in full;

12        o  Whether Intelligraphics has breached by, *inter alia*, preventing Marvell's

13           performance, or by failing to effect a formal transfer of copyright;

14        o  Whether Intelligraphics has committed fraud on the Copyright Office by

15           registering the copyright for the Motorola VRTX Port in its own name, and

16           without acknowledging the existence of Marvell's preexisting matter therein, in

17           violation of, *inter alia*, 17 U.S.C. § 106(2); and

18        o  Whether Intelligraphics' purported copyright in the Motorola VRTX Port is valid,

19           and if so, whether Marvell has made any unauthorized copy, derivative work, or

20           distribution that infringes such copyright.

21  **4.**    **MOTIONS**

22        No motions have been filed in this action.  Marvell intends to file a motion for summary

23 judgment regarding the Motorola VRTX Port early in discovery.  The parties anticipate filing

24 further motions for summary judgment after the close of discovery and at such other times as

25 may be appropriate.

26  **5.**    **AMENDMENT OF PLEADINGS**

27        The parties currently do not anticipate the need to amend their pleadings further.

28

1  6.    **EVIDENCE PRESERVATION**

2        (a)    **Intelligraphics**

3        Intelligraphics has taken steps to ensure that no evidence has been altered or destroyed

4  since the litigation started.

5        (b)    **Marvell**

6        Upon receipt of the prior action filed in Texas state court, Marvell instructed employees

7  who were likely to have documents relevant to that action to preserve their documents.

8  7.    **DISCLOSURES**

9        The parties have held a Rule 26(f) discovery conference, and have agreed to delay

10  exchange of their Rule 26(a)(1) initial disclosures until August 27, 2007.  Pursuant to Rule 26(e),

11  the parties intend to supplement their Rule 26(a)(1) disclosures in combination with their

12  document productions in response to requests for production.

13  8.    **DISCOVERY**

14        (a)    **Discovery taken to date:** By August 24, 2007, both parties will have served their

15  first round of discovery, with Marvell's being deemed served on August 17, 2007.  Both parties

16  are cooperating to arrange for the production of both Rule 26–identified documents and such

17  additional documents as are produced in response to the requests for production served.

18        (b)    **Scope of anticipated discovery:**  Discovery is expected to cover the factual and

19  legal issues identified above.

20        (c)    **Proposed limitations or modifications of the discovery rules:**  The parties

21  disagree regarding the number of depositions of factual witnesses, including third parties,

22  exclusive of depositions of expert witnesses and to establish authentication of evidence.  Plaintiff

23  proposes limiting such depositions to no more than twelve per party; while Defendant proposes

24  no more than seven depositions per party.  The parties jointly propose that the number of

25  requests for admission be limited to no more than 35 per party, exclusive of those to establish

26  authentication of evidence.  Plaintiff cannot ascertain the extent of third party discovery until the

27

28

1  documents are produced, but is concerned that additional depositions may be necessary once this

2  information is exchanged.

3            (d)       **Discovery plan pursuant to Fed. R. Civ. P. 26(f):**

4                     (i)       ***Rule 26(a) disclosures:***  The parties have agreed to delay exchange of

5  their initial disclosures pursuant to Rule 26(a)(1) until August 27, 2007.  Pursuant to Rule 26(e),

6  the parties intend to supplement their Rule 26(a)(1) disclosures in combination with their

7  document productions in response to requests for production.  At this time, the parties do not

8  propose any further changes in the timing, form, or requirement for disclosures under Rule 26(a).

9                     (ii)      ***Subjects of Discovery:***  Discovery is expected to cover the factual and

10  legal issues identified above.  The parties' proposed discovery schedule is set forth in section 17,

11  below.

12                     (iii)     ***Production of ESI:***  The parties have agreed that electronically stored

13  information presumptively will be produced as bates-numbered PDF or TIFF files. To the extent

14  that subsequent review raises any issues regarding whether examination of metadata might reveal

15  material non-cumulative information, the parties will meet and confer regarding whether such

16  information should be produced for such limited subset of documents, and if so, what procedures

17  should be followed.

18                     (iv)     ***Privilege and Trial-preparation Material:***  The parties have agreed to

19  request a protective order providing for post-production assertion of privilege or of protection as

20  trial-preparation material.

21                     (v)      ***Limits on Discovery:***  The parties disagree regarding the number of

22  depositions of factual witnesses, including third parties, exclusive of depositions of expert

23  witnesses and to establish authentication of evidence. Defendant proposes limiting such

24  depositions to no more than seven per party.  Plaintiff proposes limiting such depositions to no

25  more than twelve per party, but believes that the number of deposition may be reduced from

26  twelve to nine, depending on the evidence produced from party depositions that may obviate or

27  reduce the extent of third party discovery, but believes that depositions of Cisco and Motorola

28

1   personnel may be necessary.  The parties agree that the number of requests for admission be

2   limited to no more than 35 per party, exclusive of those to establish authentication of evidence.

3      (vi) ***Other Orders:*** The parties intend to request a protective order in the

4   general form of the Model Stipulated Protective Order adopted by this District.

5   9. **CLASS ACTIONS**

6    This matter is not a class action.

7   10. **RELATED CASES**

8    On February 19, 2007, Intelligraphics filed a breach of contract action in the District

9   Court of Dallas County, Texas alleging many of the same claims brought in this action.  Marvell

10  removed that action to the United States District Court for the Northern District of Texas and

11  filed a motion to dismiss or transfer the case to the Northern District of California.

12  Intelligraphics voluntarily dismissed the action and, on that same day, filed the present action.

13  11. **RELIEF**

14   Intelligraphics' Amended Complaint prays for:

15    o A preliminary and permanent injunction against Marvell's marketing and

16     distribution of microchips which wrongfully incorporate software developed by

17     Intelligraphics or other infringement upon Intelligraphics' copyrights;

18    o Compensatory damages for copyright infringement and the costs of the copyright

19     action, including attorneys fees;

20    o Disgorgement of all profits obtained from Marvell's wrongful use of

21     Intelligraphics' copyrighted software.

22    o Compensatory damages for breach of contract for failure to pay amounts due;

23    o An order of destruction of Marvell microchips into which MARVELL has

24     wrongfully incorporated Intelligraphic's software;

25    o Punitive damages on Intelligraphics' fraud claims;

26    o Declaratory relief estopping Marvel from redefining the "cap" imposed by the

27     contract.

28

1    Marvell's Amended Counterclaims pray for:

2        o   Specific performance of the SDLA, including but not limited to Sections 6.1(a)

3            and (b) thereof;

4        o   Rescission of Amendment 3 to the SDLA;

5        o   Restitution of all sums paid by Marvell under Amendment 3 to the SDLA, in the

6            form of the approximately $201,555.88 that Intelligraphics admits Marvell paid

7            (*see, e.g.*, Complaint, ¶ 27);

8        o   Compensatory damages to cover its cost to develop CCX software (including

9            Roaming) to substitute for that which Intelligraphics failed to deliver;

10       o   A Declaration that Amendment 4 has been executed by performance;

11       o   A Declaration that the parties' respective obligations related to the Motorola

12           VRTX Port are set forth in Amendment 4 and/or in the SDLA that it amends;

13       o   A Declaration that Marvell has fully extinguished its obligations under

14           Amendment 4;

15       o   A Declaration that Marvell owns the Motorola VRTX Port software, including all

16           intellectual property therein;

17       o   A Declaration that Intelligraphics is in breach of its duty to transfer all intellectual

18           property rights in the Motorola VRTX Port software to Marvell;

19       o   A Declaration that Marvell is not infringing any copyright Intelligraphics has in

20           the Motorola VRTX Port software;

21       o   Punitive damages; attorneys' fees and costs; and interest.

22  12.  **SETTLEMENT AND ADR**

23       The parties agree that mediation is the ADR process that is most likely to lead to prompt

24  resolution of the case.  Accordingly, on August 9, 2007. the parties filed their form Stipulation

25  and [Proposed] Order selecting mediation within 90 days (docket no. 21), which was Ordered by

26  the Court the following day (docket no. 22).  The parties have attempted to agree on the

27  necessary prerequisites for mediation, such as limited discovery or an exchange of demands and

28

counter-offers.  Although as yet, agreement has not been reached, both parties are trying to

achieve early mediation before the costs of litigation diminish the possibility of settlement.

13.    **CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES**

The parties have consented to have Magistrate Judge Spero conduct all further

proceedings including trial and entry of judgment.

14.    **OTHER REFERENCES**

The parties agree that the case is not suitable for reference to binding arbitration, a special

master, or the Judicial Panel on Multidistrict Litigation.

15.    **NARROWING OF ISSUES**

Marvell intends to file a motion for summary judgment regarding the Motorola VRTX

Port early in discovery, in order to narrow the issues in the case.

16.    **EXPEDITED SCHEDULE**

Assuming that mediation is unsuccessful, the parties do not believe that this is the type of

case that can be handled on an expedited basis with streamlined procedures.

17.    **SCHEDULING**

Plaintiff believes that defendant's schedule is far too long by virtue of the extended

period set out for fact discovery. Plaintiff believes all fact discovery can be completed by March

31, 2008 and Plaintiff's proposed schedule further adjusts the remaining trial calendaring dates to

arrive at a projected trial date about six month's earlier than that projected by Defendant.

Defendant responds that allowing additional time for fact discovery will promote the

resolution of discrete issues or the entire case, thereby either avoiding trial entirely, or

simplifying and reducing the time required.

The parties jointly note that the majority of the difference between their respective

proposed schedules lies in the amount of time allocated to fact discovery, while the amount of

time each party requests for expert discovery, dispositive motions, and trial preparation is fairly

similar.  Accordingly, while each party believes that its proposed schedule is reasonable and

appropriate, were the Court to set trial to start at a time not proposed by either party, the parties request the opportunity to confer further to propose an agreed schedule based thereon.

| Event | Plaintiff's Proposed Dates | Defendant's Proposed Dates |
|---|---|---|
| **Fact Discovery** | | |
| Commencement | August 17, 2007 | August 17, 2007 |
| Close | March 31, 2008 | August 1, 2008 |
| Discovery motions filed to be heard no later than | March 10, 2008 (3 weeks prior to close of fact discovery). | July 11, 2008 (3 weeks prior to close of fact discovery) |
| **Expert Discovery** | | |
| Opening expert reports served no later than | April 28, 2008 (4 weeks after close of fact discovery) | September 5, 2008 (5 weeks after close of fact discovery) |
| Rebuttal expert reports served no later than | May 19, 2008 (3 weeks after opening reports) | October 10, 2008 (5 weeks after opening reports) |
| Close | June 27, 2008 (6 weeks after rebuttal reports) | November 21, 2008 (6 weeks after rebuttal reports) |
| **Dispositive Motions** | | |
| Opening briefs filed no later than | August 4, 2008 (5 weeks after close of expert discovery) | January 9, 2009 (7 weeks after close of expert discovery) |
| Opposition briefs filed no later than | August 22, 2008 (3 business weeks after opening briefs) | February 6, 2009 (4 weeks after opening briefs) |
| Reply briefs filed no later than | September 5, 2008 (2 weeks after opposition briefs) | February 27, 2009 (3 weeks after opposition briefs) |
| Hearing no later than | September 19, 2008 (2 weeks after briefing complete) | March 20, 2009 (3 weeks after briefing complete) |

| Event | Plaintiff's Proposed Dates | Defendant's Proposed Dates |
|---|---|---|
| *Trial Date* | | |
| If dispositive motions have been filed | Approximately six weeks after disposition of dispositive motions (Early to mid-November 2008) | Approximately two months after disposition of dispositive motions |
| If dispositive motions have not been filed | September 2008 | March 2009 |

18.    **TRIAL**

| | Plaintiff's Estimate | Defendant's Estimate |
|---|---|---|
| Duration of trial | Not more than 100 hours | Not more than 40 hours |
| Number of fact witnesses | Not more than 12 per party | Not more than 9 per party |
| Number of expert witnesses | Not more than 3 per party | Not more than 3 per party |
| Number of exhibits | Not more than 150 | Not more than 150 |

The parties respectfully note that the above estimates have been made prior to receipt of any discovery or motion practice that might expand or narrow the issues for trial.

Defendant Marvell has demanded a jury trial. Intelligraphics will demand a jury trial in its answer to the First Amended Counterclaim, to which Marvell reserves its rights to timely object.

19.    **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS**

The parties have filed their "Certification of Interested Entities or Persons" as required by Civil Local Rule 3-16. Marvell is a wholly-owned subsidiary of Marvell Technology Group Limited, a Bermuda corporation. Other than Marvell Technology Group Limited, the parties know of no person, firm, partnership, corporation or other entity that has either: (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding.

1    20.     **OTHER MATTERS**

2          The parties are not currently aware of other matters that may facilitate the just, speedy

3    and inexpensive disposition of this matter.

4

5    Dated: August 17, 2007                    SOMMERS & SCHWARTZ LLP

6                                              By: /s/
7                                                  Andrew H. Schwartz

8                                              Attorneys for Plaintiff and Counterdefendant
                                               INTELLIGRAPHICS, INC.
9

10

11   Dated: August 17, 2007                   MAYER, BROWN, ROWE & MAW LLP

                                               By: /s/
12                                                 Joshua M. Masur

13                                             Attorneys For Defendant and Counterclaimant
                                               MARVELL SEMICONDUCTOR, INC.
14

15   *Filer's Attestation:  Pursuant to General Order No. 45, Section X(B), the filer hereby attests that*
16   *the signatories' concurrence in the filing of this document has been obtained.*

17

18

19

20

21

22

23

24

25

26

27

28