SOMMERS & SCHWARTZ LLP
ANDREW H. SCHWARTZ (SBN 100210)
    ahs@sommersschwartz.com
FRANK F. SOMMERS, IV (SBN 109012)
    ffs@sommersschwartz.com
550 California Street
Sacramento Tower, Suite 700
San Francisco, California 94104
Telephone: (415) 955-0925
Facsimile:  (415) 955-0927

Attorneys for Plaintiff and Counterdefendant
INTELLIGRAPHICS, INC.

MAYER BROWN LLP
MICHAEL A. MOLANO (SBN 171057)
    mmolano@mayerbrown.com
SHIRISH GUPTA (SBN 205584)
    sgupta@mayerbrown.com
JOSHUA M. MASUR (SBN 203510)
    jmasur@mayerbrown.com
JUNG-YING JOANNE LIAO (SBN 227329)
    jliao@mayerbrown.com
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, Califonia 94306-2112
Telephone: (650) 331-2000
Facsimile:  (650) 331-2060

Attorneys for Defendant and Counterclaimant
MARVELL SEMICONDUCTOR, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO DIVISION

| | |
|---|---|
| INTELLIGRAPHICS, INC.,<br><br>*Plaintiff and Counterdefendant,*<br><br>v.<br><br>MARVELL SEMICONDUCTOR, INC.,<br><br>*Defendant and Counterclaimant.* | Case No. C-07-2499 JCS<br><br>**JOINT UPDATED CASE MANAGEMENT STATEMENT**<br><br>Date: Friday, December 21, 2007<br>Time: 1:30 p.m.<br>Courtroom A, 15th Floor |

Pursuant to the Court's October 1, 2007 Order (docket no. 30), Plaintiff and Counterdefendant INTELLIGRAPHICS, INC. ("Intelligraphics" or "Plaintiff") and Defendant and Counterclaimant MARVELL SEMICONDUCTOR, INC. ("Marvell" or "Defendant") hereby jointly submit this Joint Updated Case Management Statement in preparation for the December 21, 2007 Further Case Management Conference.

For the Court's convenience, the parties have annotated and highlighted the headings of those sections of this Updated Case Management Statement that contain substantive changes since the August 17, 2007 Joint Case Management Statement (docket no. 23). The sections that contain substantive changes are:

4.    Motions ........................................................................................17

    (a)    Plaintiff's Intended Motions ..........................................18

    (b)    Defendant's Intended Motions ........................................18

7.    Disclosures ...................................................................................18

8.    Discovery ......................................................................................19

    (a)    Discovery taken to date................................................19

    (c)    Proposed limitations or modifications of the discovery rules........19

    (d)    Discovery plan pursuant to Fed. R. Civ. P. 26(f):.........................19

        (v)    Limits on Discovery..........................................20

12.    Settlement and ADR ...................................................................22

15.    Narrowing of Issues ...................................................................22

17.    Scheduling....................................................................................23

18.    Trial..............................................................................................24

19.    Disclosure of Non-party Interested Entities or Persons............................24

1.    **JURISDICTION AND SERVICE** *[substantively unchanged]*

    (a)    **Subject matter jurisdiction:** This court has subject matter jurisdiction over the Sixth Cause of Action pursuant to 17 U.S.C. § 501 and 28 U.S.C. §§ 1331 and 1338(a) for the

1    claims purporting to arise under the laws of the United States.  This Court has subject matter

2    jurisdiction over the First, Second, Third, Fourth, Fifth and Seventh Causes of Action pursuant to

3    28 U.S.C. § 1332(a) in that the matter in controversy exceeds the sum or value of $75,000

4    exclusive of interest and costs and is between citizens of different States.  In addition, this court

5    has subject matter jurisdiction over the First, Second, Third, Fourth, Fifth and Seventh Causes of

6    Action pursuant to 28 U.S.C. § 1367(a) and the principles of supplemental jurisdiction.  This

7    Court has subject matter jurisdiction over all Counterclaims herein pursuant to 28 U.S.C.

8    § 1367(a) and the principles of supplemental jurisdiction, 28 U.S.C. § 1332(a), in that the matter

9    in controversy exceeds the sum or value of $75,000 exclusive of interest and costs and is

10   between citizens of different States, and 28 U.S.C. § 2201(a), to the extent that one or more

11   counterclaims request declaratory judgment.

12          (b)    **Personal jurisdiction and venue:**  No issues exist.

13          (c)    **Service of process:**  All parties have been served.

14

15   2.     **FACTS** *[unchanged]*

16          Intelligraphics is a device driver and systems level software development company with

17   headquarters in Dallas Texas. It writes device driver software for, among other things, Wireless

18   Local Area Network (WLAN) communications chips which may be used to connect computers

19   to the internet via wireless Access Points ("AP").  Marvell is a global semiconductor provider of

20   high-performance analog, mixed-signal, digital signal processing and embedded microprocessor

21   integrated circuits, headquartered in Santa Clara, California.

22          The parties have cooperated in creating this statement, but were unable to agree as to the

23   content or extent of the factual presentation, and have therefore produced two factual sections.

24   While requiring additional reading, comparison of the differences between the two may

25   illuminate potential issues regarding the proper scope of discovery, identity of witnesses, length

26   of trial, and other matters.

27

28

1    (a)    **Plaintiff's Statement of Facts**

2        (i)    ***Background and Glossary***

3        As the chip hardware improves, so does the programming needed to take advantage of

4    new features or capacities. Various industry standards have developed for the communications

5    protocols used by the hardware in both the chips and the access points that communicate with

6    them. When Marvell and Intelligraphics signed the SDLA in 2003, the most widely-adopted

7    communication protocol was "802.11," which had been created by the Institute of Electrical and

8    Electronics Engineers (IEEE) and termed "IEEE 802.11." This protocol, originally developed in

9    1997, had since been updated and augmented, with new versions given a letter designation *i.e.*

10    802.11(a), (b) etc.

11        The various projects requested by Marvell during the period 2003-2006 either involved

12    Intelligraphics upgrading or changing its pre-existing 802.11 software to comply with the new

13    versions of 802.11 – (b), (g), (e) etc then on the market, or involved altering the software so that

14    it would operate under a different computer operating system ("porting").

15        Communications chip software for 802.11-compliant devices comprises three main

16    groups of programs- the firmware, the driver and the supplicant. These distinctions are important

17    for understanding the scope of the various projects commissioned by Marvell herein.

18        "Firmware" is software that resides on the chip and handles traffic between the hardware

19    functions performed by the chip and the driver software.  The "driver" is software installed on

20    the host device (such as a PC or cell phone) in which the chip is installed, and which handles

21    communication between the firmware, the operating system (such as Microsoft Windows) and

22    the supplicant.  The "supplicant" is a hardware-independent software application installed on the

23    host device that, among other things, handles the network security authentication routines needed

24    for the host device to gain access to the network.

25        "Roaming" describes how a wireless device in motion moves its connection from one AP

26    to another.  Roaming software seeks to connect the host device to the AP that provides the best

27    connection quality for that location – much like a cell phone switches cell towers while in

28

1   motion. The way a wireless device and its software handles roaming depends on the degree of

2   mobility required by the designer. For example, a laptop moved from home to the office needs to

3   sample the available access points detected once it is turned on, but may thereafter not retest the

4   signal strengths it encounters very often, on the assumption that it will not be moved until it is

5   turned off. By contrast, a cell phone needs to sample the access points much more frequently,

6   given that it may be traveling at a high rate of speed while in use.

7          "CCX" (Cisco Client Extensions) is a Cisco Systems proprietary extension of the 802.11

8   standard for use with Cisco-manufactured wireless access points. CCX's stated purpose is to

9   enhance security, availability, mobility and reliability. One benefit of CCX is that it will more

10  flexibly distribute traffic between access points. For example a CCX enabled device attempting

11  to log on to a given CCX enabled access point may be told to go elsewhere for load balancing

12  purposes, even though the given access point is in fact the strongest signal detected by the client

13  communications chip at the time. Absent specific programming to handle CCX-specific

14  instructions, a chip attempting to establish contact with a Cisco access point may encounter

15  difficulties.

16              (ii)     *The Original 2003 Software Development and License Agreement*

17         In 2003, Marvell hired Intelligraphics to adapt Intelligraphics's basic 802.11(b) and (g)

18  software to run on a Marvell 88W8510 chipset. The parties entered into a Software Development

19  and Licensing Agreement ("SDLA"), which had Exhibits that described the scope of work and

20  the applicable specifications. The 2003 engagement was a fixed price contract, with development

21  and payment milestones defined during contract negotiations:

22             In consideration of Intelligraphics' (sic) development of the
               Custom Software pursuant to Section 2.1 hereof, Marvell agrees to
23             pay Intelligraphics a development fee (the "Development Fee") in
               the amounts set forth in the Development Schedule and upon
24             acceptance of each Milestone Deliverable, including the Custom
               Software, pursuant to a Statement of Acceptance in accordance
25             with Section 3.2 hereof by Marvell. (emphasis added.)

26         The 2003 contract called for Intelligraphics both to convert its software to run on the

27  Marvell chipset, and to incorporate certain CCX features into that software. The contract granted

28

1    Marvell a preliminary license to Intelligraphics's "Basic Code," and then set out the following

2    language about when transfer of intellectual property rights occurred:

> At such time as MARVELL has paid the applicable Development
> Fee for each Milestone Deliverable delivered by Intelligraphics
> and accepted by MARVELL, then MARVELL shall assume
> ownership of such Milestone Deliverable and all Intellectual
> Property Rights therein.

6    After Intelligraphics started work on the CCX portion of the 2003 contract, however,

7    Cisco objected that Marvell's CCX license did not permit Intelligraphics to have possession of

8    either the CCX software or any CCX-based development tools provided by Marvell. After an

9    attempt to work around this problem, work on the CCX portion of the contract was terminated.

10    (Intelligraphics was subsequently told that Marvell had completed the CCX-related work on the

11    802.11 driver modules.) Intelligraphics completed the rest of the work called out under the

12    specifications, as modified by Marvell during the work. Marvell failed to pay Intelligraphics

13    until Intelligraphics filed suit in Dallas, whereupon Marvell paid the amounts agreed upon in the

14    SDLA.

15            (iii)     ***The 2004 802.11 Driver Upgrades***

16    In February 2004, Marvell approached Intelligraphics and requested that it create

17    software for Marvell's "Libertas" chips, which were part of the 88W8510 chipset family, to

18    comply with the 802.11(i) and QoS 802.11(e) specifications. The parties executed Amendment 1

19    to the SDLA. Amendment 1 had Attachments 1 and 2, which were defined as becoming Exhibits

20    H and I to the SDLA.  This work involved upgrading the driver software to meet the listed

21    802.11 specifications. Intelligraphics performed this work and was paid the fixed price on the

22    schedule set out in the contract.

23    In September 2004, Marvell and Intelligraphics entered into Amendment 2 to the SDLA,

24    which defined new scope of work documents, Attachment 3 and 4, which became Exhibits J and

25    K to the SDLA. Under those Attachments Intelligraphics agreed to upgrade the driver software

26    to incorporate the then-most-current specifications for WME and WSM (versions of 802.11(e)

27

28

1    specifications developed by the Wi-Fi Alliance) into the 802.11(e) and (i) compliant driver

2    modules. Intelligraphics performed and was paid for this work.

3              (iv)    ***The 2006 Projects in Issue Here***

4           In mid 2006, Intelligraphics was again asked by Marvell to perform additional work on

5    the software that supported the Libertas chipset, as well as to port the driver to another operating

6    system. By August 2006 both parties had executed Amendment 3 to the SDLA, which had two

7    attachments, 1 and 2.  Attachment 1 is titled "Hourly WLAN Vista Driver Development."

8    Attachment 2 is titled "Hourly CCXv4 Funk Supplicant Development."  The two attachments are

9    defined as Exhibits L and M to the SDLA.  Work on the projects started in June 2006.  Both

10   Attachments had new, identical language regarding payment:

11            8. PAYMENTS

12                    (a)    <u>Development Fee</u>.  Intelligraphics will perform all
       services and develop all Milestone Deliverables , including the

13     Custom Software, described herein on a time and materials basis at
       the rate of $135 U.S. Dollars per development man hour, subject to

14     Section 8(b) below. At the end of each day Intelligraphics
       engineers will report to Marvell all hours worked with a brief

15     summary of the work completed for that day.

16                    (b)    All services provided by Intelligraphics under this
       Statement of Work (Exhibit M) and the Statement of Work that is

17     attached as Exhibit L to the Agreement , are subject to a
       cumulative cap of two hundred fifty thousand U.S. Dollars (the

18     "Payment Cap"). Unless otherwise mutually agreed upon by the
       parties in writing, in no event shall the fees payable by Marvell to

19     Intelligraphics  exceed the Payment Cap for any and all services
       rendered by Intelligraphics under this Statement of Work (Exhibit

20     M) and the Statement of Work that is attached as Exhibit L to the
       Agreement.[1]

21          The parties disagree about how many separate projects Marvell initiated in 2006 and

22   whether all are covered by Amendment 3. Plaintiffs contend that Marvell requested four different

23   projects in connection with the 802.11 upgrades. The first was VISTA, the second work on the

24   CCXv4 Supplicant, <u>the third</u> Advanced Roaming, and the fourth the porting of the driver to the

25   VRTX operating system, (the "Motorola project.")  Intelligraphics contends and Marvell denies

26

27   ───────────────
     [1] The only difference between the two Attachments was the reversal of the Exhibit L and M references from one to

28   the other in order to properly call out the other attachment

1    that the only projects intended to be documented by Amendment 3 when it was executed by the

2    parties was the VISTA and CCXv4 Supplicant agreement.  Intelligraphics contends, and Marvell

3    denies that the Advanced Roaming project was subject to the $250,000 cap set out in

4    Attachments 1 and 2 to Amendment 3.

5         Intelligraphics contends that the Advanced Roaming project initially involved upgrading

6    the roaming functions to make laptop chips perform more like cellphone chips- *i.e.* check more

7    often for movement. Marvell contends that Advanced Roaming is part of the CCX Supplicant

8    project. Intelligraphics contends that Advanced Roaming was entirely separate from the CCX

9    Supplicant project, but that since the CCX Supplicant work had its own roaming specifications,

10   major modifications in the Advanced Roaming project were required by Marvell. Both parties

11   agree that the Vista project was only worked on briefly, then stopped. Marvell paid the hourly

12   amounts billed on the Vista project.

13        Separate and apart from the language quoted above about renegotiation of the payment

14   amounts due, Intelligraphics contends, and Marvell denies, that Marvell agreed that the Payment

15   language of paragraph 8 allowed Intelligraphics to stop work when the cap was reached –

16   whether or not all the work required to meet the specifications had been completed – and turn

17   over the appropriate software and copyrights to Marvell, which could finish the work itself if it

18   did not want to increase the authorized expenditure level. Marvell contends - and Intelligraphics

19   denies - that Intelligraphics promised to complete all the work called for under Amendment 3 for

20   $250,000. Marvell also contends, and Intelligraphics denies, that all of the 2006 802.11 work

21   other than the Vista and Motorola projects, however labeled, was covered by Amendment 3 and

22   hence the cap.

23        Work on the Motorola project started in August 2006 and continued until March 2007. In

24   March 2007, Marvell created a document titled "Amendment 4" that it contends covers the

25   Motorola project, and which, though never signed, it contends was 'executed by performance' by

26   the parties. Intelligraphics denies this contention.

27

28

1   There are significant disputes between the parties concerning the changes in the scope of

2   work that did or did not occur during the summer and fall of 2006. Intelligraphics contends that

3   the "Hourly CCXv4 Funk Supplicant" work originally did not involve any work on the driver

4   portions of the software, all of which was being performed by Marvell's Santa Clara and German

5   software engineering group and other outside consultants. Later, however, Marvell requested that

6   Intelligraphics perform work on the CCX roaming portion of the driver software. There are also

7   disputes between the parties as to whether Marvell had created problems with the CCX driver

8   code by its simultaneous work on the CCX driver software, which problems Intelligraphics had

9   to debug in order to accomplish its own work.

10   In the fall of 2006, Intelligraphics contends that it informed Marvell that the $250,000

11   payment limit would be exceeded if the work were to continue, and Marvell stated that

12   authorizations for additional funds would be secured in connection with the parties discussions

13   as to how much additional work would be needed to complete the Advanced Roaming software

14   and what final delivery schedules would be required. Marvell requested that Intelligraphics

15   continue work on the projects before such negotiations were finalized and such authorizations

16   were received. Intelligraphics informed Marvell that the cost to complete all work that Marvell

17   had requested by the fall of 2006 would cost close to $500,000. Thereafter, Intelligraphics turned

18   over what it describes as the Advanced Roaming code.  Intelligraphics contends, and Marvell

19   denies, that this Advanced Roaming code materially met all contract requirements, to the extent

20   that Marvell's actions permitted them to be met.

21   After discussions that lasted until approximately March 2007, Intelligraphics contends

22   that Marvell refused to pay any sums over $250,000 for the other work and indeed contended

23   that no contract existed for such work such that while Intelligraphics was required to complete

24   the work, Marvell had no obligation to make any further payments whatsoever. As of the date

25   that litigation was instituted by Intelligraphics, Marvell had only paid approximately $205,000

26   for the work on the 2006 802.11 under Amendment 3.

27

28

1    Marvell had paid Intelligraphics' invoices for the Motorola project as they were received

2  by issuing purchase orders against which it paid the invoices. In the Fall of 2006, Marvell

3  informed Intelligraphics that the Motorola project fees could not exceed $100,000.

4  Intelligraphics objected and, after some discussion, provided an estimate of its cost to complete

5  of approximately $126,000. Intelligraphics delivered the Motorola project software on January

6  26, 2007 and continued to support the Marvell team until March, 2007, after having been paid

7  approximately $103,000.  Marvell did not pay or offer to pay without conditions the remaining

8  sums due on the Motorola project until after Intelligraphics sued, which Intelligraphics contends,

9  and Marvell denies, also occurred only after Marvell had materially breached the parties'

10  contract for the Amended Roaming work.  Finally, Intelligraphics contends, and Marvell denies,

11  that Intelligraphics properly registered its copyright to the software it developed on the Motorola

12  project, which was to become the property of Marvell only after Marvell paid all amounts due

13  and owing, on a time and material basis, for such software.

14        (v)    ***Post Litigation Events***

15    After litigation was instituted and this suit filed in California, Marvell sent counsel for

16  Intelligraphics a CD which it said contained all code written under Amendment 3, stated that it

17  had not kept any copies (other than a copy in counsel's possession) and notified Intelligraphics

18  that it was rescinding the contract for that work, demanding in consequence the return of the

19  $201,555.88 paid for that work. In addition, in June, 2007, Marvell issued what it described as a

20  purchase order covering the outstanding amounts claimed in the suit for the Motorola software as

21  defined in Attachment 4. In July 2007 it tendered to counsel a check for the amount for the

22  unpaid Motorola work set out in the complaint, and demanded the assignment of all copyrights to

23  the software pursuant to the SDLA. Intelligraphics rejected that legal position because of the

24  legal issues identified below.

25

26

27

28

1    (b)    **Defendant's Statement of Facts**

2    This dispute arises out of the parties' agreement or agreements under which

3  Intelligraphics developed certain network client software for use with certain Marvell chips that

4  comply with the widely-used IEEE 802.11 wireless networking protocol and variants thereof.

5    (i)    ***Amendment 3, including "Advanced Roaming"***

6    In 2003, Marvell hired Intelligraphics to write 802.11(b) and (g) drivers for Marvell's

7  88W8510 chipset, and the parties entered a Software Development and Licensing Agreement

8  ("SDLA").  Amendments 1 and 2 to the SDLA governed Intelligraphics' additional work on

9  drivers for the 88W8510 chipset family.

10   In mid-2006, the parties executed Amendment 3 to the SDLA, which had two

11  attachments, titled "Hourly WLAN Vista Driver Development" and "Hourly CCXv4 Funk

12  Supplicant Development," respectively.  The attachments to Amendment 3 provided, *inter alia*,

13  that:

14       Intelligraphics will perform all services … on a time and materials
         basis at the rate of $135 U.S. Dollars per development man hour,…
15       subject to a cumulative cap of two hundred fifty thousand U.S.
         Dollars (the "Payment Cap"). Unless otherwise mutually agreed
16       upon by the parties in writing, in no event shall the fees payable by
         Marvell to Intelligraphics exceed the Payment Cap for any and all
17       services rendered by Intelligraphics.

18   Marvell contends that Intelligraphics' work on "Advanced Roaming"[2] software delivered

19  by Intelligraphics in the Fall of 2006 was covered by Amendment 3, either because it was part of

20  CCX or because it replaced the Vista portion of the work, which was terminated by agreement of

21  the parties before Intelligraphics performed substantial work.  Therefore, Marvell contends that

22  the Advanced Roaming code is subject to the cumulative $250,000 Payment Cap set forth in

23  Amendment 3.

24   Marvell contends that the cumulative Payment Cap was expressly intended to provide a

25  sufficient "cushion" that all work thereunder could be completed as promised.  Intelligraphics

26  contends that it was allowed to stop work when the cap was reached, and had no obligation to

27  ───────────────
[2] When "roaming," a wireless device switches its connection from one "access point" to another "access point"
28  depending on factors such as the distance and strength of the wireless signals.

1  complete the work set forth therein within the budget or on time, notwithstanding the language of

2  Amendment 3.

3          Based on Intelligraphics' complaint, in which it contends that it knew at the time

4  Amendment 3 was executed that its obligations could not be performed within the cumulative

5  $250,000 Payment Cap, Marvell asserts that Intelligraphics' execution of Amendment 3 with

6  such knowledge constituted fraud.  Intelligraphics also contends, and Marvell denies, that

7  Marvell believed that Intelligraphics' obligations could not be performed under the Payment

8  Cap.

9          In the Fall of 2006, Intelligraphics informed Marvell that it would not complete the work

10 under Amendment 3 within the $250,000 Payment Cap.  Although Amendment 3 unambiguously

11 requires that, "[u]nless otherwise mutually agreed upon by the parties in writing, in no event

12 shall the fees payable by Marvell to Intelligraphics exceed the Payment Cap for any and all

13 services rendered by Intelligraphics," there is no dispute that no such writing ever was executed.

14 Nonetheless, Intelligraphics contends, and Marvell denies, that Marvell orally agreed to exceed

15 the $250,000 cap, or to obtain authorization to do so.  Marvell further contends that even if any

16 such oral agreement ever were made – which it was not – Amendment 3 would render it void.

17         Intelligraphics delivered the code for the Advanced Roaming portion of CCX to Marvell.

18 That Advanced Roaming code was the only portion of the CCX code that Intelligraphics ever

19 delivered to Marvell under Amendment 3.  Marvell contends that Intelligraphics failed ever to

20 follow the delivery procedures set forth in the SDLA, as amended.

21         In late February 2007, Intelligraphics permitted Marvell engineers to inspect the

22 incomplete and nonfunctional CCX code as it then existed.  As provided by the SDLA, Marvell

23 delivered a list of errors found during that inspection to Intelligraphics, but Intelligraphics never

24 attempted to cure those errors, or otherwise responded to the statement of errors.  Marvell

25 contends that, under the express terms of the SDLA, that failure constituted a material breach.

26         After this litigation commenced, Marvell returned the code for the Advanced Roaming

27 portion of CCX to counsel for Intelligraphics, and certified that other than a copy retained by

28

1  counsel for purposes of this litigation, it had destroyed all copies of that code it ever has

2  possessed.

3      Marvell also contends, and Intelligraphics denies, that Intelligraphics also has materially

4  breached other provisions of the SDLA, as set forth in the sealed version of Marvell's

5  counterclaims.

6          (ii)     *The Motorola VRTX Port*

7      Pursuant to agreement of the parties, from about August 2006 through about March 2007,

8  Intelligraphics "ported," or translated, a Marvell 802.11n Windows XP driver to a Motorola

9  platform running the VRTX real-time operating system.  Although the parties never signed an

10 amendment to the SDLA to cover the Motorola VRTX Port, the parties exchanged drafts of an

11 Amendment 4 that was intended to do so.  Marvell contends, and Intelligraphics denies, that the

12 parties accepted the draft Amendment 4 by performing their respective obligations thereunder.

13 Marvell informed Intelligraphics that the Motorola VRTX Port fees could not exceed $100,000

14 and paid Intelligraphics's invoices for the Motorola VRTX Port as they were received by issuing

15 purchase orders against which it paid the invoices.

16     Intelligraphics invoiced Marvell for a total of approximately $100,000, which amount

17 Marvell had paid in full prior to the inception of litigation.  However, Intelligraphics' complaint

18 asserted that Intelligraphics was due an additional $22,273.98 for its work on the Motorola

19 VRTX Port.  Thereafter, Marvell first issued a purchase order, and then a check, for the

20 additional $22,273.98 that the Complaint alleged was unpaid.  Intelligraphics has rejected that

21 check, and apparently contends that Marvell has not fulfilled its relevant obligations to

22 Intelligraphics.  To date, however, Intelligraphics has not identified any purported obligation

23 related to the Motorola VRTX Port that Marvell has failed to fulfill.

24     Although Intelligraphics' complaint admits that the Motorola VRTX Port is merely a

25 derivative of Marvell's own software, Intelligraphics filed the copyright registration in its own

26 name.  According to the Copyright Office database, Intelligraphics did not limit its registration to

27 the new matter it allegedly added, but claimed registration in the entire Motorola VRTX Port.

28

3.    **LEGAL ISSUES** *[unchanged]*

    (a)    **Plaintiff's Statement of Legal Issues**

    1.    Whether Marvell materially breached its contract with Intelligraphics, in connection with the development of the CCX Roaming and Advanced Roaming software by:

        (a) refusing to pay the full amount of the "development fee," on a time and materials basis;

        (b) refusing to pay $250,000 for this software development unless Intelligraphics agreed to complete substantial additional work that Intelligraphics contends was made necessary by Marvell change orders; and,

        (c) claiming – during negotiations when Intelligraphics' time and material billings reached $250,000 – that Intelligraphics did not have any binding contract for development of the Advanced Roaming Code, so that Marvell could walk away without paying anything further for such software development while Intelligraphics remained obligated to complete the development.

    2.    If Marvell did materially breach the contract, what damages are recoverable by Intelligraphics?

    3.    Whether Intelligraphics materially breached its contract for Advanced Roaming development by failing to create acceptable software or by failing to complete all work for $250,000, and, if so, the damages recoverable by Marvell for that breach.

    4.    Whether the agreements of the parties in Amendment 3 contemplated a "cap" of $250,000, under which Intelligraphics was obligated to perform all the work called out in the specifications for that Amendment under the cap, or whether Amendment 3 was an hourly contract for time and materials, allowing Intelligraphics to either stop work at the end of the agreed amount and deliver its work product and intellectual property rights therein, or to renegotiate for additional sums if Marvell wished it to continue.

1       5.     To what extent does the SDLA, Amendment 3 and the developmental fee

2  definition of Attachments 1 and 2 govern all of the projects undertaken by Intelligraphics for

3  Marvell under the SDLA in 2006?

4       6.     Whether –  because Marvell refused to pay the amounts due, as "developmental

5  fees" for the CCX Roaming and Advanced Roaming software development –  Marvell never met

6  the SDLA's requirement for obtaining copyrights to the subject software.

7       7.     Whether Marvell owes Intelligraphics over $340,000 for breach of contract.

8       8.     Whether Amendment 3 was effectively and timely rescinded by Marvell and, if

9  so, what the obligations did Intelligraphics have thereafter.

10       9.     Whether Marvell thereafter infringed upon Intelligraphics' software on its

11  Advanced Roaming software through unauthorized use.

12       10.     Whether the parties contemplated that the Motorola code would be developed by

13  Intelligraphics on a time and materials basis, without any fixed price, and whether Marvell's

14  unilateral attempt to impose a $100,000 fixed price on that work constituted a breach of the

15  parties' agreement.

16       11.     Whether the payment and copyright terms governing Intelligraphics's work on the

17  Motorola code was governed by: (a) a contract based on the unexecuted Amendment 4, (b) an

18  oral contract; (c) an implied contract based on the past contractual terms and course of conduct

19  of the parties, or (d) *quantum meruit*.

20       12.     If Marvell materially breached its contract with Intelligraphics for any of the

21  reasons set out in issue number one, was Intelligraphics excused from any further obligation with

22  regard to the Motorola code –  including any obligation to transfer the copyright for that code to

23  Marvell.

24       13.     If Marvell did not breach any contractual obligation related to the contract to

25  develop the Motorola software, is Intelligraphics now obligated to transfer its copyright in that

26  software to Marvell?

27       14.     Whether Marvell is liable for either or both of two intentional frauds:

28

1                (a) fraud in the inducement in telling Intelligraphics that the payment

2                provisions of Amendment 3 and its Attachments meant that the $250,000 "cap"

3                was a limit on the hourly work that, when reached, required Intelligraphics either

4                to stop work and turn over its work to date, along with the intellectual property

5                rights therein, or secure additional payment authorizations from Marvell; and,

6                (b) fraud in inducing Intelligraphics to continue software development

7                work once the "cap" was reached through Marvell's representation that it would

8                in fact pay all amounts over $250,000 incurred by Intelligraphics to finish the

9                projects requested by Marvell.

10      15.     If Marvell is liable for fraud, what are the recoverable damages therefore?

11      16.     Whether, if Marvell is liable for either fraud described in issue number 11 above,

12  Intelligraphics was excused from any further obligations with regard to the development of the

13  Motorola code – including the transmittal of copyrights from Intelligraphics to Marvell related

14  thereto.

15      17.     Whether Intelligraphics is liable for fraud because it agreed to complete the work

16  contemplated by Amendment 3 for $250,000 at a time that Intelligraphics knew that the work

17  could not be completed for that price?  If so, what are the recoverable damages for such fraud?

18      18.     Assuming that Marvell never properly obtained Intelligraphics's copyrights under

19  the  SDLA and the amendments thereto, whether Marvell has infringed upon Intelligraphics's

20  copyrights on the Motorola code through unauthorized use in chips manufactured for Motorola

21  or others?

22      19.     If Marvell is found to have infringed upon Intelligraphics's copyrights, the extent

23  to which Intelligraphics may be awarded damages based on that part of the profit Marvell has

24  obtained through such use that is reasonably related to Intelligraphics's software?

25      20.     Whether – if Marvell has infringed upon Intelligraphics's software – its

26  infringement was willful, requiring an award of attorneys fees to Intelligraphics and negating

27

28

1   Marvell's right to use overhead to offset the profits it received through unauthorized use of

2   Intelligraphics's software.

3       21.    Whether Intelligraphics or Marvell are liable for punitive damages for fraud.

4       (b)    **Defendant's Statement of Legal Issues**

5   Defendant submits that the primary disputed legal issues regarding Amendment 3,

6   including Advanced Roaming, include:

7       o   Whether Amendment 3, including its Payment Cap, binds the parties, including

8           whether such Payment Cap was waived by alleged oral agreement despite express

9           contractual language prohibiting oral modification;

10      o   Whether development of Advanced Roaming was governed by Amendment 3 or

11          by an implied contract, and if by implied contract, the terms thereof;

12      o   Whether Intelligraphics fraudulently induced Marvell to enter Amendment 3 by

13          agreeing to the Payment Cap despite its alleged knowledge that it could not

14          perform thereunder;

15      o   Whether Intelligraphics' fraud entitled Marvell to rescind Amendment 3, and if

16          so, whether Marvell's restoration of all consideration furnished by Intelligraphics

17          thereunder effected rescission;

18      o   Whether Intelligraphics breached Amendment 3 and/or the SDLA by, *inter alia*:

19          o   Failing ever to deliver the contracted software, let alone to do so on time and

20              within budget;

21          o   Failing to follow the delivery procedures set forth in the SDLA;

22          o   Failing to cure the errors identified in the inspected code;

23          o   Violating the confidentiality provision of the SDLA;

24          o   Registering the copyright in the Advanced Roaming code in its own name;

25              and

26          o   Filing suit in Texas despite the forum selection requirements of the SDLA;

27      o   Whether Intelligraphics' breaches excused any alleged actions by Marvell;

28

1    o   Whether Intelligraphics' damages, if any, are limited or eliminated by, *inter alia*,

2        the limitation of liability clause of the SDLA or the costs avoided by

3        Intelligraphics nonperformance; and

4    o   Whether Intelligraphics' purported copyright in the Advanced Roaming code is

5        valid, and if so, whether Marvell has made any unauthorized copy, derivative

6        work, or distribution that infringes such copyright.

7    Defendant submits that the primary disputed legal issues regarding the Motorola VRTX

8    Port include:

9    o   Whether development of the port is governed by Amendment 4 or an implied

10       contract, and if by implied contract, the terms thereof;

11   o   Whether Marvell has completed performance by payment in full;

12   o   Whether Intelligraphics has breached by, *inter alia*, preventing Marvell's

13       performance, or by failing to effect a formal transfer of copyright;

14   o   Whether Intelligraphics has committed fraud on the Copyright Office by

15       registering the copyright for the Motorola VRTX Port in its own name, and

16       without acknowledging the existence of Marvell's preexisting matter therein, in

17       violation of, *inter alia*, 17 U.S.C. § 106(2); and

18   o   Whether Intelligraphics' purported copyright in the Motorola VRTX Port is valid,

19       and if so, whether Marvell has made any unauthorized copy, derivative work, or

20       distribution that infringes such copyright.

21

22   **4.    MOTIONS** *[changed]*

23   No motions have been filed in this action.  In addition to the motions identified below,

24   the parties anticipate filing further motions for summary judgment after the close of discovery

25   and at such other times as may be appropriate.

26

27

28

(a)     **Plaintiff's Intended Motions**

Plaintiff has initiated the meet and confer process regarding defendant's failures to produce documents requested.  In the event that counsel are not able to work out this dispute, plaintiff will move to compel.

(b)     **Defendant's Intended Motions**

As of this writing, in the near future, Marvell intends to file dispositive motions regarding at least (a) Intelligraphics' copyright claims, and (b) the Motorola VRTX Port.  Counsel for Marvell is in the process of initiating the formal meet and confer process with regards to certain instructions by counsel for Intelligraphics at the deposition of Scott Lawson, and in the event that meet and confer fails to resolve the issues, will move to compel and for sanctions.

5.     **AMENDMENT OF PLEADINGS** *[unchanged]*

The parties currently do not anticipate the need to amend their pleadings further.

6.     **EVIDENCE PRESERVATION** *[unchanged]*

(a)     **Intelligraphics**

Intelligraphics has taken steps to ensure that no evidence has been altered or destroyed since the litigation started.

(b)     **Marvell**

Upon receipt of the prior action filed in Texas state court, Marvell instructed employees who were likely to have documents relevant to that action to preserve their documents.

7.     **DISCLOSURES** *[changed]*

The parties held a Rule 26(f) discovery conference and exchanged their Rule 26(a)(1) initial disclosures in August, 2007.

1    **8.    DISCOVERY** *[changed]*

2    (a)    **Discovery taken to date** *[changed]*:  Each party has propounded and responded

3    to one set of requests for production of documents and one set of interrogatories.  The parties

4    have produced documents pursuant to Rule 26(a)(1) and the requests for production.

5    Intelligraphics has taken the deposition of Bart Giordano, and Marvell has taken the deposition

6    of Scott Lawson.  The parties are meeting and conferring regarding the possibility of continued

7    depositions of both deponents.

8    (b)    **Scope of anticipated discovery** *[unchanged]*:  Discovery is expected to cover the

9    factual and legal issues identified above.

10   (c)    **Proposed limitations or modifications of the discovery rules** *[changed]*:

11   The parties agree that the number of depositions of factual witnesses, including third parties,

12   exclusive of depositions of expert witnesses and to establish authentication of evidence, shall be

13   limited to no more than twelve per party.  The parties agree that the number of requests for

14   admission be limited to no more than 35 per party, exclusive of those to establish authentication

15   of evidence.  The parties may request leave to increase or alter these limits upon a showing of

16   good cause based on further discovery.

17   (d)    **Discovery plan pursuant to Fed. R. Civ. P. 26(f):**

18   (i)    ***Rule 26(a) disclosures** [substantively unchanged]*:  The parties agreed to

19   delay exchange of their initial disclosures pursuant to Rule 26(a)(1) until August 27, 2007.

20   Pursuant to Rule 26(e), the parties agreed to supplement their Rule 26(a)(1) disclosures in

21   combination with their document productions in response to requests for production.  At this

22   time, the parties do not propose any further changes in the timing, form, or requirement for

23   disclosures under Rule 26(a).

24   (ii)    ***Subjects of Discovery** [unchanged]*:  Discovery is expected to cover the

25   factual and legal issues identified above.  The parties' proposed discovery schedule is set forth in

26   section 17, below.

27

28

(iii)    ***Production of ESI*** *[unchanged]*:  The parties have agreed that electronically stored information presumptively will be produced as bates-numbered PDF or TIFF files. To the extent that subsequent review raises any issues regarding whether examination of metadata might reveal material non-cumulative information, the parties will meet and confer regarding whether such information should be produced for such limited subset of documents, and if so, what procedures should be followed.

(iv)    ***Privilege and Trial-preparation Material*** *[unchanged]*:  The parties have agreed to request a protective order providing for post-production assertion of privilege or of protection as trial-preparation material.

(v)    ***Limits on Discovery*** *[changed]*:  The parties agree that the number of depositions of factual witnesses, including third parties, exclusive of depositions of expert witnesses and to establish authentication of evidence, shall be limited to no more than twelve per party.  The parties agree that the number of requests for admission be limited to no more than 35 per party, exclusive of those to establish authentication of evidence.  The parties may request leave to increase or alter these limits upon a showing of good cause based on further discovery.

(vi)    ***Other Orders:***  The parties requested a protective order in the general form of the Model Stipulated Protective Order adopted by this District.

9.    **CLASS ACTIONS**

This matter is not a class action.

10.    **RELATED CASES** *[unchanged]*

On February 19, 2007, Intelligraphics filed a breach of contract action in the District Court of Dallas County, Texas alleging many of the same claims brought in this action.  Marvell removed that action to the United States District Court for the Northern District of Texas and filed a motion to dismiss or transfer the case to the Northern District of California. Intelligraphics voluntarily dismissed the action and, on that same day, filed the present action.

11.    **RELIEF** *[unchanged]*

Intelligraphics' Amended Complaint prays for:

- o   A preliminary and permanent injunction against Marvell's marketing and distribution of microchips which wrongfully incorporate software developed by Intelligraphics or other infringement upon Intelligraphics' copyrights;

- o   Compensatory damages for copyright infringement and the costs of the copyright action, including attorneys fees;

- o   Disgorgement of all profits obtained from Marvell's wrongful use of Intelligraphics' copyrighted software.

- o   Compensatory damages for breach of contract for failure to pay amounts due;

- o   An order of destruction of Marvell microchips into which MARVELL has wrongfully incorporated Intelligraphic's software;

- o   Punitive damages on Intelligraphics' fraud claims;

- o   Declaratory relief estopping Marvell from redefining the "cap" imposed by the contract.

Marvell's Amended Counterclaims pray for:

- o   Specific performance of the SDLA, including but not limited to Sections 6.1(a) and (b) thereof;

- o   Rescission of Amendment 3 to the SDLA;

- o   Restitution of all sums paid by Marvell under Amendment 3 to the SDLA, in the form of the approximately $201,555.88 that Intelligraphics admits Marvell paid (*see, e.g.*, Complaint, ¶ 27);

- o   Compensatory damages to cover its cost to develop CCX software (including Roaming) to substitute for that which Intelligraphics failed to deliver;

- o   A Declaration that Amendment 4 has been executed by performance;

- o   A Declaration that the parties' respective obligations related to the Motorola VRTX Port are set forth in Amendment 4 and/or in the SDLA that it amends;

1     o   A Declaration that Marvell has fully extinguished its obligations under

2         Amendment 4;

3     o   A Declaration that Marvell owns the Motorola VRTX Port software, including all

4         intellectual property therein;

5     o   A Declaration that Intelligraphics is in breach of its duty to transfer all intellectual

6         property rights in the Motorola VRTX Port software to Marvell;

7     o   A Declaration that Marvell is not infringing any copyright Intelligraphics has in

8         the Motorola VRTX Port software;

9     o   Punitive damages; attorneys' fees and costs; and interest.

10

11  **12.**    **SETTLEMENT AND ADR** *[changed]*

12      On December 7, 2007, the parties held a mediation before John B. Bates, Jr., of JAMS

13  San Francisco.  That mediation was unsuccessful.

14

15  **13.**    **CONSENT TO MAGISTRATE JUDGE FOR ALL PURPOSES** *[unchanged]*

16      The parties have consented to have Magistrate Judge Spero conduct all further

17  proceedings including trial and entry of judgment.

18

19  **14.**    **OTHER REFERENCES** *[unchanged]*

20      The parties agree that the case is not suitable for reference to binding arbitration, a special

21  master, or the Judicial Panel on Multidistrict Litigation.

22

23  **15.**    **NARROWING OF ISSUES** *[changed]*

24      In order to narrow the issues in the case, Marvell intends to file dispositive motions

25  regarding Intelligraphics' copyright claims and the Motorola VRTX Port early in discovery.

26

27

28

16.    **EXPEDITED SCHEDULE** *[substantively unchanged]*

The parties do not believe that this is the type of case that can be handled on an expedited basis with streamlined procedures.

17.    **SCHEDULING** *[changed]*

On August 25, 2007, the Court issued a Minute Order (docket no. 26) setting the pretrial conference for April 3, 2009, and the trial date for April 20, 2009, with trial set for 12 days. Accordingly, the parties jointly propose the following schedule:

| Event | Date |
| --- | --- |
| *Fact Discovery* | |
| Commencement | August 17, 2007 |
| Discovery motions filed to be heard no later than | July 18, 2008 |
| Close | August 1, 2008 |
| *Expert Discovery* | |
| Opening expert reports served no later than | August 29, 2008 |
| Rebuttal expert reports served no later than | September 24, 2008 |
| Close | October 16, 2008 |
| *Dispositive Motions* | |
| Opening briefs filed no later than | December 12, 2008 |
| Opposition briefs filed no later than | January 9, 2009 |
| Reply briefs filed no later than | January 23, 2009 |
| Hearing no later than | February 6, 2009 |
| *Trial* | |
| Pretrial Conference | April 3, 2009, 1:30 pm |
| Trial *(12 days; Monday through Thursday, 8:30 am to 1:30 pm)* | April 20, 2009, 8:30 am |

18.    **TRIAL** *[changed]*

| Duration of trial | 12 days |
|---|---|
| Number of fact witnesses | Not more than 12 per party |
| Number of expert witnesses | Not more than 3 per party |
| Number of exhibits | Not more than 150 |

The parties respectfully note that the above estimates have been made prior to receipt of discovery or motion practice that might expand or narrow the issues for trial.

Defendant Marvell demanded a jury trial with its answer and counterclaims. Intelligraphics demanded a jury trial in its answer to the First Amended Counterclaim, to which Marvell reserves its rights to timely object.

19.    **DISCLOSURE OF NON-PARTY INTERESTED ENTITIES OR PERSONS** *[changed]*

The parties have filed their "Certification of Interested Entities or Persons" as required by Civil Local Rule 3-16. Marvell is a wholly-owned subsidiary of Marvell Technology Group Limited, a Bermuda corporation. Other than Marvell Technology Group Limited, the parties know of no person, firm, partnership, corporation or other entity that has either: (i) a financial interest in the subject matter in controversy or in a party to the proceeding; or (ii) any other kind of interest that could be substantially affected by the outcome of the proceeding.

Intelligraphics is the wholly-owned subsidiary of IGX, Inc. Plaintiff will file an amended Interested Parties statement.

20.    **OTHER MATTERS** *[unchanged]*

        The parties are not currently aware of other matters that may facilitate the just, speedy and inexpensive disposition of this matter.


Dated: December 14, 2007                SOMMERS & SCHWARTZ LLP

                                        By: */s/*_____
                                            Frank F. Sommers, IV

                                            Attorneys for Plaintiff and Counterdefendant
                                            INTELLIGRAPHICS, INC.


Dated: December 14, 2007                MAYER BROWN LLP

                                        By: */s/*_____
                                            Joshua M. Masur

                                            Attorneys for Defendant and Counterclaimant
                                            MARVELL SEMICONDUCTOR, INC.

*Filer's Attestation:  Pursuant to General Order No. 45, Section X(B), the filer hereby attests that the signatories' concurrence in the filing of this document has been obtained.*