**FILED**

JUL **2 9** 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTELLIGRAPHICS, INC.,

        Plaintiff,

        v.

MARVELL SEMICONDUCTOR, INC.,

        Defendants.

———————————————————/

No. C-07-2499 JCS

REDACTED

**ORDER RE: 1) MARVELL SEMICONDUCTOR, INC.'S MOTION FOR JUDGMENT ON THE PLEADINGS ON THE SIXTH CAUSE OF ACTION (COPYRIGHT) OF THE FIRST AMENDED COMPLAINT; AND 2) MARVELL SEMICONDUCTOR, INC.'S MOTION FOR PARTIAL SUMMARY JUDGMENT ON INTELLIGRAPHICS' CLAIM THAT MARVELL FRAUDULENTLY INDUCED INTELLIGRAPHICS TO ENTER AMENDMENT 3 [Docket Nos. 72, 73]**

~~FILED UNDER SEAL~~

## I.    INTRODUCTION

In this action, Plaintiff Intelligraphics, Inc. ("Intelligraphics"), a software development company, has sued Marvell Semiconductor, Inc. ("Marvell") in connection with a contract between Intelligraphics and Marvell for the development of customized software for a new wireless networking chip produced by Marvell. The following motions are currently before the Court: 1) Marvell Semiconductor, Inc.'s Motion for Judgment on the Pleadings on the Sixth Cause of Action (Copyright) of the First Amended Complaint (the "Rule 12(c) Motion"); and 2) Marvell Semiconductor, Inc.'s Motion for Partial Summary Judgment on Intelligraphics' Claim that Marvell Fraudulently Induced Intelligraphics to Enter Amendment 3 (the "Summary Judgment Motion"). All parties have consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c). The Court held a hearing on the motions on Friday, July 25, 2008, at 9:30 a.m. For the reasons stated below, the Rule 12(c) Motions is DENIED. The Summary Judgment Motion is DENIED, in part with prejudice and in part without prejudice.



United States District Court

For the Northern District of California

## II.     BACKGROUND

### A.     First Amended Complaint

In July 2003, Intelligraphics and Marvell entered into a "SOFTWARE DEVELOPMENT AND LICENSE AGREEMENT (the "SDLA"). First Amended Complaint ("FAC"), ¶ 7. The SDLA set forth the terms that governed the licensing and customization of drivers and related custom software that Intelligraphics was to provide to Marvell for its new 802.11 wireless networking chip product. *Id.* According to the complaint, the SDLA provided for payment as follows:

> The contract was set up such that the price to be paid for the work on each piece of "Custom Software" developed thereunder was to be set out in a "Development Schedule with Milestone Deliverables" for each individual "Custom Software" project. The "Development Fee" for each piece of software was defined as the total of all related "Milestone" payments. Exhibit C to the contract set out a series of Milestone Deliverables, each associated with a fixed fee. The contract then declared that *only* when a specific Milestone Deliverable for a specific software project was delivered by INTELLIGRAPHICS and accepted by MARVELL, per a Statement of Acceptance – and INTELLIGRAPHICS received payment in full for that Milestone Deliverable by MARVVELL – were the intellectual property rights to that specific Milestone Deliverable transferred from INTELLIGRAPHICS to MARVELL.

*Id.* (emphasis in original). The SDLA granted Marvell a non-exclusive provisional license to Intelligraphics's existing Basic 802.11-related modules (the "Base Code") which was to be incorporated into the final product. FAC, ¶ 8. This was necessary to allow Marvell to test and inspect the software prior to acceptance. *Id.* The SDLA provided further that Intelligraphics would retain ownership rights to the custom software until Marvell paid the applicable Development Fee for each Milestone Deliverable delivered by Intelligraphics and accepted by Marvell, at which point Marvell would assume ownership of the Milestone Deliverable and all intellectual property rights therein. FAC, ¶ 9. Intelligraphics completed the 802.11 project in 2003 and Marvell accepted and paid for it. FAC, ¶ 10.

Subsequently, the parties developed a number of "scope of work" ("SOW") attachments to the SDLA, containing new projects. FAC, ¶¶ 11-12. According to Intelligraphics, by the time these

2

United States District Court

For the Northern District of California

1  agreements were reached, the parties had "changed their definition of 'Development Fee' to be based

2  on a 'time and materials' billing, rather than fixed fee." FAC, ¶ 11. This new definition of the

3  Development Fee was incorporated into the individual amendments relating to the SOWs. *Id.*

4  In May 2006, the parties began discussions relating to two new projects: 1) the "Hourly Vista

5  WLAN Driver Development" project (the "Vista Project"); and 2) the Hourly CCX v.4 Funk

6  Supplicant Development project (the "CCX Project"). FAC, ¶ 13. These projects were documented

7  by creating Amendment 3 to the SDLA, along with Attachments 1 and 2 thereto. *Id.*, ¶ 14.

8  Attachment 2 contained a section entitled "Payments" that stated, in part, as follows:



17  FAC, ¶¶ 14-15 (quoting Section 8 of SDLA).

18  According to Intelligraphics, when it suggested during the negotiation of Amendment 3 and

19  the attachments thereto that a provision be added to the payment provision specifically stating that

20  Intelligraphics would stop work on the two projects when the $250,000.00 Payment Cap had been

21  reached absent a renegotiation of the payable amount, Marvell employee Carey LeRoy represented in

22  a telephone conversation that such a provision was unnecessary because the provisions quoted above

23  already indicated that this was the case. FAC, ¶ 16. Marvell further represented that it would pay for

24  all of Intelligraphics's work on a time and materials basis and negotiate accordingly when and if the

25  total Development Fees on the two projects reached $250,000.00. *Id.*

26  Work began immediately for the Vista Project but the project lasted only for a short period of

27  time. FAC, ¶ 17. Work on the CCX Project did not begin right away because Marvell had not

28  finalized contract negotiations with Funk Software for access to the Funk Supplicant source code,

3

1   which was necessary in order for Intelligraphics to proceed with the CCX Project. *Id.* In the

2   meantime, Marvell requested that Intelligraphics begin work on a third new project, the Advanced

3   Roaming Project ("Advanced Roaming Project"). In the First Amended Complaint, Intelligraphics

4   describes the Advanced Roaming Project as follows:

> This involved rewriting software and firmware for the MARVELL
> wireless networking cards to address what MARVELL had determined
> were new customer requirements for wireless mobility in laptops and
> other mobile wireless devices. In this context the term 'roaming'
> describes the software functions that are necessary to manage a
> wireless device that is moving through a Multiple Access Point
> environment, where the signal strength and usability of each Access
> Point may quickly change as the device changes location relative to
> each Access Point. By contrast, the original 802.11 roaming software
> (that portion having been developed by MARVELL in the firmware)
> had minimal roaming support and used relatively primitive roaming
> algorithms.

12  FAC, ¶ 18. As originally envisioned, the Advanced Roaming Project involved only making

13  modifications to the original 802.11 device drive code and did not contemplate adding any CCX

14  functionality to the driver or require any work on any Supplicant modules. FAC, ¶ 19. However,

15  while detailed specifications for the Advanced Roaming Project were created, no Scope of Work

16  attachment for Amendment 3 was ever created. *Id.* Intelligraphics alleges that "at all times, both

17  INTELLIGRAPHICS and MARVELL understood – after the three projects (Vista, [Advanced

18  Roaming] and CCX) had ultimately started in 2006 – that it would be impossible for

19  INTELLIGRAPHICS to complete all the work listed in the specifications for these projects for

20  anywhere near $250,000." *Id.*

21       Intelligraphics began billing on the Vista and Advanced Roaming projects in June 2006.

22  FAC, ¶ 20. Amendment 3 and Attachments 1 and 2 were executed in early August and work began

23  on the CCX project in mid-August. *Id.* However, sometime after work began on the Advanced

24  Roaming Project (whether before or after Amendment 3 and the attachments were executed is

25  unclear), Marvell changed the scope of the CCX Project and the Advanced Roaming Project. FAC,

26  ¶ 21. In particular, Intelligraphics alleges as follows:

> MARVELL had originally assigned INTELLIGRAPHICS to work
> only on the Supplicant part of the CCX project, while MARVELL –
> which had its own software development capability – would handle the

27

28

United States District Court

For the Northern District of California

4

United States District Court

For the Northern District of California

> driver and firmware modifications. After the Advanced Roaming project started, however, MARVELL informed INTELLIGRAPHICS that it wanted INTELLIGRAPHICS to take over the work on some of the CCX modifications to the driver software as well. Specifically, it instructed INTELLIGRAPHICS to completely scrap the advanced roaming design and all work completed thus far on the project and to redesign it from scratch so that it included comprehensive support for both Advanced and CCX roaming. This redesign was not completed until late August – well after the contract was signed by INTELLIGRAPHICS.

*Id.*

Intelligraphics further alleges that it encountered problems with the driver portion of the project almost immediately "because the MARVELL-created CCX version 1-4 code embedded in the 802.11 software was found to be defective, thus causing another significant increase in the amount of work required for the now combined CCX Roaming project." FAC, ¶ 22.

According to Intelligraphics, in August 2006 Marvell assigned another project to Intelligraphics, asking it to rewrite Marvell's 802.11 Windows-based software so it could run in a VRTX environment on Motorola's MIPS processor (the "Motorola Project"). FAC, ¶ 23. Intelligraphics alleges that the parties agreed this work would be performed on a time and materials basis. FAC, ¶ 24. Again, however, no contractual addenda or amendments to the SDLA were executed. *Id.* For Intelligraphics's work on the Motorola Project Marvell issued purchase orders in $20,000.00 increments and paid Intelligraphics against those purchase orders. *Id.*

In December 2006, Marvell employees Mahesh Venkantramin and Bart Giordano contacted Intelligraphics and orally declared that work on the Motorola Project could not exceed $100,000.00. *Id.* At that point, Intelligraphics had already performed $80,000.00 of work on the project. *Id.* Intelligraphics, in turn, informed Marvell that it could not finish the project under this cap and that it would stop work if Marvell refused to pay for work actually performed. FAC, ¶ 25. In January and February of 2007, Marvell's Alan Cunningham verbally told Intelligraphics that Marvell would continue to pay for work on the Motorola Project on a time and materials basis up to Intelligraphics's estimated total of $126,000.00. *Id.* Cunningham confirmed the same in an email dated January 22, 2007. *Id.* Relying on these assurances, Intelligraphics continued to perform work and turn over

1  source code to Marvell, ultimately performing $122,273.98 in work on the project. *Id.* However,

2  Marvell refused to pay beyond the $100,000.00. *Id.*

3        In the meantime, Intelligraphics was working on the Vista, Advanced Roaming and CCX

4  projects, for which Intelligraphics reported and billed Marvell all together. FAC, ¶ 26. When total

5  development fees, on a time and materials basis, began to approach $250,000.00, Intelligraphics

6  contacted Marvell to obtain authorization to work beyond the $250,000.00 cap. *Id.* Marvell's Bart

7  Giordano orally asked Intelligraphics to continue work on the Advanced Roaming and CCX Projects

8  without waiting for a new amendment and represented that Marvell would continue to pay

9  Intellligraphics for work on the projects even though the cost was going to exceed $250,000.00. *Id.*

10  Based on these representations, Marvell continued to work on the Advanced Roaming and CCX

11  Supplicant Projects and turned over a version of the source code for the Advanced Roaming Project.

12  *Id.*

13        However, at a meeting in March 2007, Marvell's Sameer Bindichani refused to pay beyond

14  the $250,000.00 cap. FAC, ¶ 27. In fact, Intelligraphics alleges, Marvell paid only $201,555.88.

15  *Id.* According to Intelligraphics, Bindichani took the position that Intelligraphics had no contract for

16  the Advanced Roaming Project and, therefore, could not collect for its work on that project. *Id.*

17  Subsequently, Marvell asserted, through its counsel, that the $250,000.00 cap applied "not only to

18  the entire CCX project (CCX Advanced Roaming and CCX Supplicant work) but to the earlier

19  [Advanced Roaming] work as well." *Id.*

20        According to Intelligraphics, Marvell failed to pay over $362,000.00 for work performed by

21  Intelligraphics. *Id.* Intelligraphics further alleges that Marvell is shipping the Advanced Roaming

22  software (with embedded CCX features) to Marvell's customers as part of its wireless

23  communications cards and has obtained significant profits from sales of Intelligraphics' copyrighted

24  Advanced Roaming software. Similarly, Intelligraphics alleges, Marvell has not fully paid the

25  Development Fee for the Motorola Project software that was delivered to Marvell and Marvell is, as

26  a result, obtaining significant profits from sales of Intelligraphics' copyrighted custom software for

27  the Motorola project. FAC, ¶ 29. According to Intelligraphics, it has registered copyrights in the

28

United States District Court

For the Northern District of California

1  Motorola Project VRTX Ported 802.11 driver code and in the Advanced Roaming software. FAC, ¶

2  30.

3       Based on the factual allegations summarized above, Intelligraphics asserts the following

4  seven claims: 1) breach of contract; 2) breach of implied contract; 3) fraud in the inducement;

5  4) fraud; 5) declaratory relief – equitable estoppel; 6) copyright infringement under 17 U.S.C. §§ 101

6  *et seq.*; and 7) quantum meruit.

7       Intelligraphics' claim for fraud in the inducement (Claim 3) is based on the allegation that

8  Marvell intentionally made its promise to pay all Development Fees on a time and materials basis for

9  development and delivery of the Vista, Advanced Roaming and Hourly CCX V.4 Funk Supplicant

10 Development software and to negotiate in good faith any contractual amendments necessary to

11 facilitate such payment without any intent to perform. FAC, ¶ 44. Similarly, Intelligraphics alleges,

12 Marvell intentionally promised to pay all Development Fees on a time and material basis for the

13 development and delivery of the custom software to be created in the Motorola Project without any

14 intention to perform. FAC, ¶ 45. Intelligraphics alleges that it reasonably relied on these promises

15 "to enter into the SDLA, Amendment 3 and the agreement to pay for the development of the

16 Advanced Roaming software and the Motorola project software on the same basis as set forth in

17 Amendment 3 and to commence and continue work on these software development projects in an

18 effort to complete them." FAC, ¶ 46. Marvell's true intention in making these promises,

19 Intelligraphics alleges, was to attempt to avoid payment for a substantial part of Intelligraphics' work

20 on the projects while still demanding delivery of the software. FAC, ¶ 48.

21       Intelligraphics' copyright infringement claim (Claim 6) is based on the allegation that

22 Marvell's incorporation of Intelligraphics' "copyrighted Advanced Roaming Software and its

23 Motorola development project software into its microchips and marketing and selling these

24 microchips . . . without making the payment of all Development Fees incurred for such work on a

25 time and materials basis necessary to the effective purchase of INTELLIGRAPHICS' intellectual

26 property rights with regard to such software – constitute infringement of INTELLIGRAPHICS'

27 copyrights." FAC, ¶ 68.

28

United States District Court
For the Northern District of California

**B.    The Motions**

**1.    The Rule 12(c) Motion**

Marvell brings a motion for judgment on the pleadings, pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, asserting that Intelligraphics's copyright infringement claim (Claim 6) fails as a matter of law because the alleged acts of copyright infringement fall within the scope of the license from Intelligraphics provided for in the SDLA.  Motion at 1.  In support of its position, Marvell points to provisions in the SDLA creating two different sets of intellectual property rights for software developed under the agreement.  *Id.* at 3.  First, the SDLA grants a license to Marvell for "Base Code" and "Enhanced Base Code."  *Id.*  According to Marvell,  Base Code is the software originally developed by Intelligraphics before the parties entered the SDLA.  *Id.* (citing FAC, Ex. A (SDLA), ¶ 1.2 (defining Base Code)).  Enhanced Base Code is Base Code that has been modified for use by Marvell. *Id.* (citing FAC, Ex. A (SDLA), ¶ 1.6 (defining Enhanced Base Code)). Second, the SDLA addresses intellectual property rights for Custom Software to be developed by Intelligraphics for Marvell.  *Id.*  According to Marvell, Custom Software included "*all* software delivered by Intelligraphics to Marvell, including not only the Base Code and Enhanced Base Code originally developed by Intelligraphics, but also certain 'Marvell Software as modified by Intelligraphics and '███████████████████████████████████████'" *Id.* at 4 (citing FAC, Ex. B (Amendment 3) at ¶ 1 (amending definition of Custom Software set for in ¶ 1.3 of SDLA)).

The license of Base Code and Enhanced Base Code is set forth in Section 4.1 of the SDLA, which states as follows:



Motion at 4 (quoting FAC, Ex. A (SDLA), § 4.1)).  Notwithstanding the license granted in Section 4.1, Intelligraphics retained ownership of the intellectual property rights in the Base Code and Enhanced Code, as set forth in Section 6.3 of the SDLA:



Motion at 4 (quoting FAC, Ex. A (SDLA), § 6.3).

The intellectual property rights for the Custom Software, under the SDLA, is addressed in Section 6 of the agreement.  Section 6.1(a) establishes the following ownership rights:

Motion at 5 (quoting FAC, Ex. A (SDLA), § 6.1(a)).

In addition to the ownership rights set for in Section 6.1(a), the SDLA granted Marvell certain rights to use the Custom Software, as set forth in Section 6.1(b), which provides as follows:

United States District Court

For the Northern District of California

1

2

3

4

5

6  Motion at 5 (quoting FAC, Ex. A (SDLA), § 6.1(b) (emphasis added by Marvell)).  According to

7  Marvell, these rights constitute a broad license in the Custom Software that covers the conduct that

8  Intelligraphics alleges infringes its copyrights.  *Id.*

9       Marvell argues that the rights set forth in Section 6.1(b) of the SDLA covers the conduct on

10  which Intelligraphics bases its copyright infringement claim and therefore, that claim must fail.  It

11  notes that under the SDLA, Marvell is required to pay the Development Fee only after it has

12  evaluated and tested the Custom Software and issued a Statement of Acceptance.  Motion at 6 (citing

13  FAC, Ex. A (SDLA), § 3.2 (providing that Marvell

14

15                                                       ), § 5.1 (providing that Intelligraphics

16

17                                    ).  Therefore, Marvell asserts, the rights for the

18  Custom Software set forth in Section 6.1(b) cannot be contingent upon payment of the Development

19  Fees but rather, represent a license that was necessary to allow the testing envisioned under the

20  agreement.  Motion at 9.

21       In its Opposition, Intelligraphics challenges Marvell's interpretation of Section 6.1(b),

22  arguing that it does not create a license of any kind and that not even a "testing license" was required

23  under the SDLA because Section 3.2 gave Marvell the explicit right to test the software that

24  Intelligraphics developed for Marvell.  Motion at 9-10.  Rather, Intelligraphics asserts, Section 6 of

25  the SDLA is about ownership.  *Id.* at 11.  It points out that the first sentence of Section 6.1(b) states

26  that "

27              . . . ."  *Id.* at 13.  This phrase, Intelligraphics asserts, implies that subsection b refers to

28  the rights that had already been purchased by Marvell by paying the Development Fee, as set forth in

1   subsection a, and not to any license for testing. *Id.* at 13-14. Intelligraphics acknowledges that there

2   is a discrepancy between the definition of Custom Software, which defines Custom Software as

3   software that is already "tested and fully functional," and the language of Section 3.2, which requires

4   Marvell to "evaluate and test the . . . Custom Software" (implying that Custom Software also

5   encompasses software that has not yet been tested and accepted). *Id.* at 5-6. It concludes, however,

6   that this inconsistency is merely a drafting error on the part of Marvell's legal department (which

7   drafted the SDLA). *Id.* Intelligraphics argues that when read in light of the entire agreement –

8   which uses the word "license" only in Section 4.1, for the Base Code and Enhanced Base Code, – it

9   is clear that this drafting error does not reflect any intent by the parties to create a testing license for

10  the Custom Software. *Id.* at 7. Finally, Intelligraphics argues that to the extent the language of the

11  SDLA might be found to be ambiguous as to whether an implied license was created, the existence

12  of an implied license depends on the intent of the parties, which is a question of fact that must be left

13  to the jury.

14          In its Reply, Marvel points to the phrase in Section 6.1(b) giving Marvell the right to

15  "sublicense" the Custom Software source code, implying that the section addressed Marvell's rights

16  to the Custom Software as a licensee and not as a copyright owner (in which case, it would be

17  expected that the word "license" would have been used). Reply at 1. Marvell also argues that the

18  right to sublicense would be surplusage if Section 6.1(b) referred to Marvell's rights after obtaining

19  ownership of the rights to the custom software because only licensees – and not copyright owners –

20  are required to obtain permission to grant sublicenses. *Id.* To the extent that Section 6.1 might

21  arguably be interpreted to require payment of the Development Fee in subsection a as a condition

22  precedent for the rights set forth in subsection b, Marvell argues that this is insufficient to support

23  Intelligraphics's claim because conditions precedent are disfavored and will not be read into

24  contracts unless required plain, unambiguous language. *Id.* at 3 (citing *Effects Assocs. v. Cohen*, 908

25  F.2d 555, 559 n.7 (9th Cir. 1990). Further, Marvell rejects Intelligraphics' reliance on the first

26  sentence of Section 6.1(b) as an indication that subsection b referred to Marvell's rights to the

27  Custom Software after paying the Development Fee. Reply at 4. Rather, Marvell asserts, this

28  sentence refers to Marvell's preexisting rights to its own software, defined in Section 1.9 of the

11

United States District Court

For the Northern District of California

1  SDLA. *Id.* That section defines "Marvell Software" as including certain software that Marvell was
2  required to provide to Intelligraphics. *Id.* Finally, Mavell argues that to the extent the SDLA granted
3  Marvell a license in the Custom Software, Intelligraphics cannot pursue its copyright claims because
4  it did not terminate or rescind that agreement. *Id.* at 4-5.

5      **2.    The Summary Judgment Motion**

6       Marvell seeks summary judgment as to Intelligraphics' claim for fraudulent inducement on
7  the basis that the alleged false promise that Intelligraphics asserts induced it to enter into
8  Amendment 3 – namely, the promise to pay all Development Fees earned on a time and material
9  basis notwithstanding the $250,000.00 payment cap – cannot be considered under the parol evidence
10  rule because it contradicts the terms of the written contract. Summary Judgment Motion at 1.
11  Marvell further argues that even assuming that Marvell falsely represented to Intelligraphics the
12  meaning of the payment terms of Amendment 3, Intelligraphics could not have reasonably relied on
13  this representation and therefore, Intelligraphics's claim for fraudulent inducement fails on that basis
14  as well. *Id.*

15       Regarding the parol evidence rule, Marvell relies on California law, citing to Cal. Civ. Proc.
16  Code § 1856(a). *Id.* at 4. That section provides:

17            Terms set forth in a writing intended by the parties as a final
          expression of their agreement with respect to such terms as are
18            included therein may not be contradicted by evidence of any prior
          agreement or of a contemporaneous oral agreement.
19

20  Cal. Civ. Proc. Code § 1856(a). Because the SDLA contains an integration clause, Marvell asserts, it
21  is the final expression of the parties' agreement and therefore, the parol evidence rule applies.
22  Summary Judgment Motion at 6 (citing SDLA, § 12.10). Section 12.10 of the SDLA provides as
23  follows:

24

25

26

27

28





FAC, Ex. A (SDLA), § 12.10. Further, Marvell argues, Marvell's alleged promise that it would pay for work on the projects that exceeded the $250,000.00 cap directly contradicts the express terms of the contract, which imposes a $250,000.00 cap in the absence of a written agreement by the parties modifying the payment cap. Summary Judgment Motion at 7 (quoting FAC, Ex. B (Amendment 3), Section 8).

Regarding Intelligraphics's alleged reliance on Marvell's counsel's representations as to the meaning of Section 8 of Amendment 3 (containing the $250,000.00 cap), Marvell argues that such reliance could not have been reasonable because, under California law, parties to an arms-length transaction are not required to explain to each other the terms of a written contract. *Id.* at 8. Morever, Marvell argues, the alleged representations were directly contradicted by the terms of the contract and therefore, Intelligraphics could not have reasonably relied on the representations. *Id.* at 9.

In support of its Summary Judgment Motion, Marvell filed a Joint Statement of Facts on Marvell Semiconductor, Inc.'s Motion for Partial Summary Judgment on Intelligraphics' Claim that Marvell Fraudulently Induced Intelligraphics to Enter Amendment 3 ("Joint Statement"). In the Joint Statement, the parties stipulated to four undisputed facts: 1) that Intelligraphics developed certain software for Marvell pursuant to the SDLA, which was executed in July 2003 and constitutes admissible evidence: 2) that in 2006 the parties entered into Amendment 3 to the SDLA, under which Intelligraphics was to develop the Vista WLAN Driver and the CCX v.4 Funk Supplicant and which constitutes admissible evidence; 3) the language contained in Section 8 of Amendment 3, addressing payment; and 4) that subsequent to execution of Amendment 3, the parties never signed any other amendment to the SDLA. *Id.* at 1-2. In addition, the parties agreed that for the purposes of the Summary Judgment motion only, the allegations contained in paragraphs 16, 44, and 46 –

United States District Court
For the Northern District of California

1  describing the alleged representations by Marvell counsel Carey LeRoy relating to the payment

2  provision, alleging that Marvell made these representations without any intention to perform, and

3  alleging that Intelligraphics reasonably relied on the representations – may be treated as actually

4  proved. *Id.* at 2-3.

5      In its Opposition, Intelligraphics argues that the parol evidence rule does not apply because

6  the alleged representations by Marvell's counsel do not contradict the terms of the contract but

7  rather, are consistent with the terms of the contract. Summary Judgment Opposition at 11-13.

8  Further, Intelligraphics cites to California case law that holds that the existence of an integration

9  clause in a contract, while possibly relevant to breach of contract claims, does not apply to a claim

10  for fraud in the inducement. *Id.* at 13-15. This is because fraud in the inducement renders the entire

11  contract (including the integration clause) voidable. *Id.* With respect to the reasonableness of

12  Intelligraphics's reliance on Marvell's representations regarding the meaning of the Payment

13  provision, Intelligraphics argues that Marvell has waived its right to make this argument by

14  stipulating, in the Joint Statement, that Intelligraphics reasonably relied on Marvell's representations.

15  *Id.* at 15. Intelligraphics also argues that the cases cited by Marvell holding that a party could not

16  rely on the representations of the opposing party as to the meaning of a contract are limited to cases

17  involving arbitration clauses. *Id.* at 15-17.

18  **III.    ANALYSIS**

19      **A.    Legal Standard**

20          **1.    Federal Rule of Civil Procedure 12(c)**

21      Pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, a party may move for

22  judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial."

23  Fed.R.Civ. P. 12(c). "'A judgment on the pleadings is properly granted when, taking all the

24  allegations in the pleadings as true, the moving party is entitled to judgment as a matter of law.'"

25  *Milne ex rel. Coyne v. Stephen Slesinger, Inc.*, 430 F.3d 1036, 1042 (9th Cir. 2005) (quoting *Owens*

26  *v. Kaiser Found. Health Plan, Inc.*, 244 F.3d 708, 713 (9th Cir. 2001)). "A copy of a written

27  instrument that is an exhibit to a pleading is a part of the pleading for all purposes." Fed. R. Civ. P.

28  10(c).

**United States District Court**
For the Northern District of California

### 2.    Federal Rule of Civil Procedure 56(c)

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993). Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323. On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

### 3.    California Law Governing Contract Interpretation and the Consideration of Extrinsic Evidence

In determining whether a copyright holder has granted an implied, non-exclusive copyright license, the court looks to state law so long as it does not conflict with the federal Copyright Act. *Foad Consulting Group, Inc. v. Musil Govan Azzalino*, 270 F.3d 821, 827 (9th Cir. 2001) (holding that California's parol evidence rule does not conflict with the Copyright Act). Here, it is undisputed that the state law that should be applied in determining whether the SDLA grants an implied license to Marvell is California contract law. It is also undisputed that California law governs Intelligraphics' state law claim for fraud in the inducement. Thus, to the extent that both of Marvell's motions turn, in part, on the Court's interpretation of provisions of the SDLA, California law governing the interpretation of contracts applies to both of Marvell's motions.

United States District Court
For the Northern District of California

1    Under California law, the role of courts in construction of contract language is to determine

2 "what the parties meant by the words they used." *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage &*

3 *Rigging Co.,* 69 Cal. 2d 33, 38 (1968). Under California Civ. Proc. Code Section 1856(a), "[t]erms

4 set forth in a writing intended by the parties as a final expression of their

5 agreement with respect to those terms as are included therein may not be contradicted by evidence of

6 any prior agreement or of a contemporaneous oral agreement" ("the parol evidence rule"). However,

7 there are exceptions to this rule. First, the court may admit parol evidence if the language of a

8 contract is ambiguous, that is, if the language is "reasonably susceptible" to the interpretation urged

9 when considered in light of the evidence presented. *Winet v. Price,* 4 App. Cal. 4th 1159, 1165

10 (1992) (citing *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage and Rigging Co.,* 69 Cal. 2d 33, 37

11 (1968)); *see also* Cal. Civ. Proc. Code Section 1856(g). Even if the Court does not, ultimately,

12 conclude that parol evidence is admissible, it should consider relevant parol evidence in making the

13 threshold determination as to whether the language is ambiguous. *Id.* Second, parol evidence may

14 also be admitted to establish fraud. Cal. Civ. Proc. Code Section 1856(g). The fraud exception does

15 not apply where a party seeks to introduce parol evidence that is "'directly at variance with the

16 promise of the writing.'" *Wang v. Massey Chevrolet,* 97 Cal. App. 4th 856, 868 n.3 (citing *Bank of*

17 *America Nat'l. Trust and Sav. Ass'n v. Pendergrass,* 4 Cal. 2d 258, 263 (1935)). Rather, it applies

18 only where the "false promise is independent of, or consistent with, the written instrument." *Id.*

19    Whether a contract provision is ambiguous is a question of law. *In re Franchise Pictures*

20 *LLC,* 2008 WL 954162 (Bkrtcy. C.D. Cal., Jan. 25, 2008) *12 (citing *Maffei v. N. Ins. Co. of New*

21 *York,* 12 F.3d 892, 898 (9th Cir. 1993)). "If it is, ordinary summary judgment is improper because

22 differing views of the intent of the parties will raise genuine issues of material fact." *Id.* On the

23 other hand, if the court finds, after considering the preliminary evidence, that the language of the

24 contract is not reasonably susceptible of the proposed interpretation and therefore, that it is

25 unambiguous, the case may be disposed of by summary judgment. *Id.* (citing *Brobeck, Phleger &*

26 *Harrison v. Telex Corp.,* 602 F.2d 866, 871-72 (9th Cir. 1979)).

27

28

United States District Court

For the Northern District of California

### B.    Summary Judgment Motion

Marvell seeks summary judgment as to Claim 3 (Fraudulent Inducement) to the extent it is based on statements made by Marvell's counsel to Intelligaphics.  Under California law, fraud in the inducement occurs "when the promisor knows what he is signing but his consent is induced by fraud, mutual assent is present, and the contract is formed, which, by reason of fraud, is voidable." *Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289, 294-95 (2005).  In this case, Intelligraphics asserts in support of its fraudulent inducement claim that it entered into Amendment 3 based, in part, on representations by Marvell concerning the meaning of the payment provision found in Attachment 2, Section 8.  In particular, Marvell's counsel is alleged to have told Intelligraphics that the payment provision, and particularly, the $250,000.00 cap, permitted Intelligraphics to stop working when the $250,000.00 cap had been reached until a new payment amount had been negotiated, and that Marvell would "negotiate accordingly" when the limit was reached.  Marvell, however, asserts that these representations cannot be considered under the parol evidence rule and therefore, it is entitled to summary judgment on the claim.  In the alternative, even if the representations are considered, Marvell argues, it is entitled to summary judgment on Claim 3 because Intelligraphics could not have reasonably relied on them.  The Court concludes that the parol evidence rule does not preclude consideration of the alleged representations and therefore, that Defendant is not entitled to summary judgment on that basis.  Further, the Court cannot find, at this stage of the case, that Intelligraphics' reliance on these representations was unreasonable because Marvell expressly stipulated, for the purposes of the Summary Judgment Motion, that reliance was reasonable.

As discussed above, the parol evidence rule permits the court to consider evidence of fraud – even where the contract represents the final agreement of the parties – so long as that evidence is not used to show a representation that directly contradicts the writing.  In this case, the representations at issue are not inconsistent with the terms of the contract themselves.  Rather, they represent a plausible *interpretation* of the significance of the payment provision in Attachment 2 to Amendment 3, namely, that Intelligraphics could stop work when the $250,000.00 cap was reached, that it would be paid for its work on a time and materials basis up to that cap, and that Marvell would negotiate in

17

United States District Court
For the Northern District of California

1  good faith to amend the cap when it was reached. In contrast, the cases cited by Marvell involved

2  fact patterns in which the representations at issue directly contradicted the terms of the contracts in

3  those cases. *See, e.g., Price v. Wells Fargo Bank*, 213 Cal. App. 3d 465, 486 (1989) (holding that

4  oral promise to extend lower interest rate to borrower plaintiffs than competing bank was

5  inadmissible under parol evidence rule because it contradicted express provision in loan agreement

6  setting forth higher interest rate); *Brinderson-Newberg Joint Venture v. Pac. Erectors, Inc.*, 971 F.2d

7  272, 280-81 (9th Cir. 1992) (holding that parol evidence rule did not allow jury to consider evidence

8  of representations that contract did not require contractor to complete work that was expressly

9  required under the contract); *Wang v. Massey Chevrolet*, 97 Cal. App. 4th 856, 876 (2002) (holding

10 that oral representation that lessor could terminate automobile lease early and purchase the vehicle

11 for a particular price were barred by parol evidence rule where the lease expressly stated that early

12 termination would not be permitted and that there would be a substantial penalty for early

13 termination). To the extent that the payment provision is reasonably susceptible to the meaning

14 advanced by Intelligraphics, the extrinsic evidence may be considered by the Court in determining

15 the significance of that provision. Therefore, the Court denies Marvell's Summary Judgment Motion

16 on this question with prejudice.

17         A separate question is whether Intelligraphics reasonably relied on the alleged representations

18 by Marvell in entering into Amendment 3. One of the elements of fraudulent inducement is

19 reasonable reliance on the alleged misrepresentations. *Kahn v. Lischner*, 128 Cal. App. 2d 480, 489

20 (1954) ("The test is not only whether the party acted in reliance on a misrepresentation, but whether

21 he was justified in his reliance"). "Except in the rare case where the undisputed facts leave no room

22 for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a

23 question of fact." *OCM Principal Opportunities Fund v. CIBC World Markets, Corp.*, 157 Cal. App.

24 4th 835, 864 (2007). California courts have, however, in a handful of cases, held as a matter of law

25 that reliance on the representations of opposing counsel on legal questions was not reasonable. *See,*

26 *e.g., Wilhelm v. Pray, Price, Williams & Russell*, 186 Cal. App. 3d 1324, 1332 (1986) (holding that

27 plaintiff who had her own attorney dismiss separate action based on representations by opposing

28 counsel could not, as a matter of law, show reasonable reliance); *Rowland v. PaineWebber Inc.*, 4

United States District Court

For the Northern District of California

1    Cal. App. 4th 279, 286 (1992) (holding that where plaintiffs asserted fraudulent inducement claim

2    based on representation by investment management company that plaintiffs did not need to read

3    written agreement containing arbitration clause, plaintiffs could not reasonably rely on that

4    representation in seeking to avoid the arbitration clause); *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841

5    F.2d 282, 287 (1988) (holding that plaintiffs could not avoid arbitration clause based on allegation

6    that defendant fraudulently misled them by failing to inform them of the meaning and effect of an

7    arbitration clause in a written agreement and stating, "[w]e know of no case holding that parties

8    dealing at arm's length have a duty to explain to each other the terms of a written contract"),

9    overruled on other grounds, *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 941 (9th Cir. 2001);

10   *West. Hosps. Fed. Credit Union v. E.F. Hutton & Co., Inc.*, 700 F. Supp. 1039, 1041 (following

11   *Cohen*, holding that plaintiff could not avoid arbitration based on allegation that defendant had

12   fraudulently induced plaintiff to sign agreement containing arbitration clause by affirmatively stating

13   that the agreement was merely "paperwork" and would not affect the plaintiff's legal rights).

14        Here, Marvell stipulated, for the purposes of the instant motion only, that Intelligraphics

15   reasonably relied on the representations of Marvell's counsel. In light of that stipulation, the Court

16   cannot enter summary judgment in favor of Marvell, at least at this stage of the case, on the basis that

17   Intelligraphics *could not* have reasonably relied on those representations. Therefore, on the question

18   of reasonable reliance, the Court denies the Summary Judgment Motion without prejudice to Marvell

19   bringing a future summary judgment motion on the issue after discovery has been completed.

20   **C.    The Rule 12(c) Motion**

21        Marvell asserts that it is entitled to judgment on the pleadings with respect to

22   Intelligraphics's copyright claim (Claim 6) because the SDLA unambiguously grants Marvell a

23   license as to the Custom Software and the conduct that Intelligraphics alleges constitutes copyright

24   infringement falls within the scope of that license. The Court, however, finds the language of the

25   SDLA to be ambiguous as to whether it created a nonexclusive license with respect to the Custom

26   Software and therefore concludes that judgment on the pleadings as to Claim 6 is inappropriate.

27        Under 17 U.S.C. § 501(b), a copyright owner may bring an action for any infringement of the

28   copyright. A copyright owner who has granted a nonexclusive license to the copyrighted material,

United States District Court

For the Northern District of California

1   however, waives the right to sue for copyright infringement unless the licensee acts outside of the

2   scope of the license. *Sun Microsystems, Inc. v. Microsoft*, 188 F.3d 1115, 1121 (9th Cir. 1999).  A

3   copyright owner may grant a nonexclusive license expressly or impliedly through conduct. *Field v.*

4   *Google, Inc.*, 412 F. Supp. 1106, 1115 (D. Nev. 2006) (citing *Effects Assocs., Inc. v. Cohen*, 908

5   F.2d 555, 558 (9th Cir. 1990) (citing 3 Melville B. Nimmer and David Nimmer, *Nimmer on*

6   *Copyright* § 10.03[A] (1989)).  "Whether express or implied, a license is a contract governed by

7   ordinary principles of state contract law." *McCoy v. Mitsuboshi Cutlery, Inc.*, 67 F.3d 917, 920 (Fed.

8   Cir. 1995) (cited with approval in *Foad*, 270 F.3d at 827 n.11).

9        Here, Marvell argues that the SDLA grants Marvell an express nonexclusive license to the

10  Custom Software, pointing to the language in Section 6.1(b) stating that Marvell is "

11

12

13                                                                        " The Court,

14  however, finds that the language of Section 6.1(b), when read in light of the entire agreement, is

15  ambiguous because it is unclear whether the rights referred to in the sentence quoted above apply to

16  the Custom Software *before* or *after* ownership rights in the Custom Software have been transferred

17  to Marvell pursuant to Section 6(a), providing for transfer after payment of the Development Fee.

18        On one hand, subsection 6.1(b) begins with the words "at all times set forth in Section

19  6.1(a)," suggesting that the rights addressed in 6.1(b) refer to Marvell's rights to the Custom

20  Software *prior* to the transfer of ownership.  Indeed, it would seem unnecessary to set forth these

21  rights if the section addressed Marvell's rights *after* the transfer of ownership.  The reference to

22  "sublicensing" the Custom Software also supports Marvell's position that the rights listed in Section

23  6.1(b) grant a license to the Custom Software prior to the transfer of ownership.

24        On the other hand, there is language in Section 6.1(b) that suggest it may refer to Marvell's

25  rights *after* the transfer of ownership and therefore does not grant Marvell a license prior to payment

26  of the Development Fee.  First, the Court notes that Section 6.1 is entitled "Ownership by Marvell of

27  the Custom Software" and does not use the word "license" anywhere in the provision (in contrast to

28  the license for the Base Code and Enhanced Base Code found in Section 4.1).  More significantly,

United States District Court

For the Northern District of California

1  the first sentence of Section 6.1(b) states that " ████████████████████████

2  ████████████████████ . . ." Marvell asserts that the use of the word "retain" in this

3  sentence merely reflects that the sentence applies to the "Marvell Software" defined in Section 1.9 of

4  the SDLA, that is, the Marvell software that was used in creating the Custom Software. In that case,

5  however, one would expect that the provision would have stated that Marvell retained ownership to

6  the source code in the *Marvell Software*, not the Custom Software. Alternatively, one might ask, if

7  the first sentence of Section 6.1(b) refers to the Marvell Software (as Marvell asserts), would it not

8  be appropriate to limit the second sentence to the Marvell Software as well?

9          The definition of Custom Software contained in Section 1.3, which covers only software that

10  is "integrated, tested and fully functional," also supports the conclusion that Section 6.1(b), in setting

11  forth Marvell's rights in the Custom Software, applies to Marvell's rights *after* ownership has been

12  transferred rather than affording a nonexclusive right to allow testing to be conducted. As

13  Intelligraphics concedes, however, the term "Custom Software" is used in contexts which imply that

14  it applies also to software that has not yet been tested. *See, e.g.*, SDLA, § 3.2 (providing that

15  Intelligraphics is to provide Marvell with the "Custom Software" for testing).

16          The Court is not persuaded by Marvell's assertion that Section 6.1(b) must be read to grant a

17  license in the Custom Software prior to the transfer of ownership in light of the obligation under the

18  SDLA to test the software prior to acceptance. As Intelligraphic's points out, Section 3.2 requires

19  Marvell to perform acceptance testing and thus, testing under that provision would not be subject to

20  a copyright action.

21          In short, when read as a whole, the SDLA is reasonably susceptible to the interpretation of

22  Section 6.1(b) of Intelligraphics and, therefore, is ambiguous. Accordingly, judgment on the

23  pleadings as to Claim 6 is inappropriate.

24  **IV.    CONCLUSION**

25          For the reasons stated above, the Summary Judgment Motion is DENIED. As to the question

26  of whether admission of the representations of Marvell's counsel is barred by the parol evidence

27  rule, the Summary Judgment Motion is DENIED with prejudice. As to the question of whether

28  Intelligraphics reasonably relied on the representations of Marvell's counsel, the Summary Judgment

1  Motion is DENIED without prejudice.  The Rule 12(c) Motion is DENIED with prejudice.

2      IT IS SO ORDERED.

3

4  Dated: July 28, 2008

5

6                                  JOSEPH C. SPERO
                                   United States Magistrate Judge
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

22

# UNITED STATES DISTRICT COURT

## FOR THE

## NORTHERN DISTRICT OF CALIFORNIA

INTELLIGRAPHICS, INC.,

        Plaintiff,

    v.

MARVELL SEMICONDUCTOR INC.,

        Defendant.

_____/

Case Number: CV07-02499 JCS

**CERTIFICATE OF SERVICE**

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 29, 2008, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Frank F. Sommers
Sommers & Schwartz LLP
550 California Street
Sacramento Tower
Suite 700
San Francisco, CA 94104

Michael A. Molano
Mayer Brown LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306-2112

Dated: July 29, 2008

Karen L. Hom

Richard W. Wieking, Clerk
By: Karen Hom, Deputy Clerk