United States District Court

For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

INTELLIGRAPHICS, INC.,

        Plaintiff,

        v.

MARVELL SEMICONDUCTOR, INC.,

        Defendants.

_____/

No. C07-02499 JCS

REDACACTED

**ORDER RE SUMMARY JUDGMENT
MOTIONS  [Docket Nos. 118, 119, 120, 133]**

~~**FILED UNDER SEAL**~~

## I.   INTRODUCTION

Plaintiff Intelligraphics, Inc. ("Intelligraphics"), a software development company, has sued Marvell Semiconductor, Inc. ("Marvell") in connection with the development by Intelligraphics of customized software for Marvell.  The following motions are currently before the Court: 1) Marvell Semiconductor, Inc.'s Motion for Partial Summary Judgment on Intelligraphics' Claim that Marvell Fraudulently Induced Intelligraphics to Enter Amendment 3 [docket no. 118] ("the Fraudulent Inducement Summary Judgment Motion"); 2)  Marvell Semiconductor, Inc.'s Motion for Partial Summary Judgment on Intelligraphics, Inc.'s Sixth Cause of Action (Copyright Infringement) [docket no. 119] ("the Copyright Summary Judgment Motion"); 3)  Marvell Semiconductor, Inc.'s Motion for Summary Judgment on Intelligraphics, Inc.'s Fourth (Fraud) and Seventh (Quantum Meruit) Causes of Action [docket no. 120] ("the Fraud/Quantum Meruit Summary Judgment Motion"); 4) Motion by Intelligraphics for Summary Adjudication that Marvell may not Recover Lost Profits from Lost Sales Pursuant to its Breach of Contract and Fraud Counterclaims (First and Second, Respectively) [docket no. 133] ("the Lost Profits Summary Judgment Motion").   All parties have consented to the jurisdiction of a United States magistrate judge pursuant to 28 U.S.C. §

United States District Court

For the Northern District of California

636(c). The Court held a hearing on the motions on Friday, January 23, 2009, at 9:30 a.m.[1]

## II.    PROCEDURAL BACKGROUND

### A.    First Amended Complaint[2]

In July 2003, Intelligraphics and Marvell entered into a "SOFTWARE DEVELOPMENT AND LICENSE AGREEMENT" (the "SDLA").  First Amended Complaint ("FAC"), ¶ 7.  The SDLA set forth the terms that governed the licensing and customization of drivers and related custom software that Intelligraphics was to provide to Marvell for its new 802.11 wireless networking chip product.  *Id.*  According to the complaint, the SDLA provided for payment as follows:

> The contract was set up such that the price to be paid for the work on each piece of "Custom Software" developed thereunder was to be set out in a "Development Schedule with Milestone Deliverables" for each individual "Custom Software" project.  The "Development Fee" for each piece of software was defined as the total of all related "Milestone" payments.  Exhibit C to the contract set out a series of Milestone Deliverables, each associated with a fixed fee.  The contract then declared that *only* when a specific Milestone Deliverable for a specific software project was delivered by INTELLIGRAPHICS and accepted by MARVELL, per a Statement of Acceptance  – and INTELLIGRAPHICS received payment in full for that Milestone Deliverable by MARVVELL – were the intellectual property rights to that specific Milestone Deliverable transferred from INTELLIGRAPHICS to MARVELL.

*Id.* (emphasis in original).  The SDLA granted Marvell a non-exclusive provisional license to Intelligraphics' existing Basic 802.11-related modules (the "Base Code") which was to be incorporated into the final product.  FAC, ¶ 8.  This was necessary to allow Marvell to test and inspect the software prior to acceptance.  *Id.*  The SDLA provided further that Intelligraphics would retain ownership rights to the custom software until Marvell paid the applicable Development Fee for each Milestone Deliverable delivered by Intelligraphics and accepted by Marvell, at which point Marvell would assume ownership of the Milestone Deliverable and all intellectual property rights

---

[1] At the same time, a hearing was held on Marvell's Motion for Sanctions [docket no. 102].  That motion will be addressed in a separate order.

[2] This section is taken from the Court's July 28, 2008 Order.

2

United States District Court

For the Northern District of California

1  therein.  FAC, ¶ 9.  Intelligraphics completed the 802.11 project in 2003 and Marvell accepted and

2  paid for it.  FAC, ¶ 10.

3       Subsequently, the parties developed a number of "scope of work" ("SOW") attachments to

4  the SDLA, containing new projects.  FAC, ¶¶ 11-12.  According to Intelligraphics, by the time these

5  agreements were reached, the parties had "changed their definition of 'Development Fee' to be

6  based on a 'time and materials' billing, rather than fixed fee."  FAC, ¶ 11.  This new definition of

7  the Development Fee was incorporated into the individual amendments relating to the SOWs.  *Id.*

8       In May 2006, the parties began discussions relating to two new projects: 1) the "Hourly Vista

9  WLAN Driver Development" project (the "Vista Project"); and 2) the Hourly CCX v.4 Funk

10  Supplicant Development project (the "CCX Project").  FAC, ¶ 13.  These projects were documented

11  by creating Amendment 3 to the SDLA, along with Attachments 1 and 2 thereto.  *Id.*, ¶ 14.

12  Attachment 2 contained a section entitled "Payments" that stated, in part, as follows:

13       a.    **Development Fee**.  Intelligraphics will perform all services
             and develop all Milestone Deliverables, including the Custom
14           Software, described herein on a time and materials basis at the
             rate of $135 U.S. Dollars per development man hour, subject to
15           Section 8(b) below. . . .

16       b.    All services provided by Intelligraphics under this Statement of
             Work (Exhibit M) and the Statement of Work that is attached
17           as Exhibit L to the Agreement [concerning the Vista Project],
             are subject to a cumulative cap of two-hundred and fifty
18           thousand U.S. Dollars (the "Payment Cap").  Unless otherwise
             mutually agreed upon by the parties in writing, in no event
19           shall the fees payable by MARVELL to Intelligraphics exceed
             the Payment Cap for all and any services rendered by
20           Intelligraphics under this Statement of Work. . . .

21  FAC, ¶¶ 14-15 (quoting Section 8 of SDLA).

22       According to Intelligraphics, It suggested during the negotiation of Amendment 3 and

23  Attachments 1 and 2 that a provision be added specifically stating that Intelligraphics would stop

24  work on the two projects when the $250,000.00 Payment Cap had been reached absent a

25  renegotiation of the payable amount. Marvell employee Carey LeRoy allegedly responded in a

26  telephone conversation that such a provision was unnecessary because the provisions quoted above

27  already indicated that this was the case.  FAC, ¶ 16.  Marvell further represented that it would pay

28  for all of Intelligraphics' work on a time and materials basis and negotiate accordingly when and if

the total Development Fees on the two projects reached $250,000.00. *Id.*

Work began immediately for the Vista Project but the project lasted only for a short period of time. FAC, ¶ 17. Work on the CCX Project did not begin right away because Marvell had not finalized contract negotiations with Funk Software for access to the Funk Supplicant source code, which was necessary in order for Intelligraphics to proceed with the CCX Project. *Id.* In the meantime, Marvell requested that Intelligraphics begin work on a third new project, the Advanced Roaming Project ("Advanced Roaming Project"). In the First Amended Complaint, Intelligraphics describes the Advanced Roaming Project as follows:

> This involved rewriting software and firmware for the MARVELL wireless networking cards to address what MARVELL had determined were new customer requirements for wireless mobility in laptops and other mobile wireless devices. In this context the term 'roaming' describes the software functions that are necessary to manage a wireless device that is moving through a Multiple Access Point environment, where the signal strength and usability of each Access Point may quickly change as the device changes location relative to each Access Point. By contrast, the original 802.11 roaming software (that portion having been developed by MARVELL in the firmware) had minimal roaming support and used relatively primitive roaming algorithms.

FAC, ¶ 18. As originally envisioned, the Advanced Roaming Project involved only making modifications to the original 802.11 device drive code and did not contemplate adding any CCX functionality to the driver or require any work on any Supplicant modules. FAC, ¶ 19. However, while detailed specifications for the Advanced Roaming Project were created, no Scope of Work attachment for Amendment 3 was ever created. *Id.* Intelligraphics alleges that "at all times, both INTELLIGRAPHICS and MARVELL understood – after the three projects (Vista, [Advanced Roaming] and CCX) had ultimately started in 2006 – that it would be impossible for INTELLIGRAPHICS to complete all the work listed in the specifications for these projects for anywhere near $250,000." *Id.*

Intelligraphics began billing on the Vista and Advanced Roaming projects in June 2006. FAC, ¶ 20. Amendment 3 and Attachments 1 and 2 were executed in early August and work began on the CCX project in mid-August. *Id.* However, sometime after work began on the Advanced Roaming Project (whether before or after Amendment 3 and the attachments were executed is

4

1  unclear), Marvell changed the scope of the CCX Project and the Advanced Roaming Project.  FAC,

2  ¶ 21.  In particular, Intelligraphics alleges as follows:

3           MARVELL had originally assigned INTELLIGRAPHICS to work
             only on the Suppliant part of the CCX project, while MARVELL –
4           which had its own software development capability – would handle
             the driver and firmware modifications.  After the Advanced Roaming
5           project started, however, MARVELL informed INTELLIGRAPHICS
             that it wanted INTELLIGRAPHICS to take over the work on some of
6           the CCX modifications to the driver software as well.  Specifically, it
             instructed INTELLIGRAPHICS to completely scrap the advanced
7           roaming design and all work completed thus far on the project and to
             redesign it from scratch so that it included comprehensive support for
8           both Advanced and CCX roaming.  This redesign was not completed
             until late August – well after the contract was signed by
9           INTELLIGRAPHICS.

10  *Id.*

11         Intelligraphics further alleges that it encountered problems with the driver portion of the

12  project almost immediately "because the MARVELL-created CCX version 1-4 code embedded in

13  the 802.11 software was found to be defective, thus causing another significant increase in the

14  amount of work required for the now combined CCX Roaming project."  FAC, ¶ 22.

15         According to Intelligraphics, in August 2006 Marvell assigned another project to

16  Intelligraphics, asking it to rewrite Marvell's 802.11 Windows-based software so it could run in a

17  VRTX environment on Motorola's MIPS processor (the "Motorola Project").  FAC, ¶ 23.

18  Intelligraphics alleges that the parties agreed this work would be performed on a time and materials

19  basis.  FAC, ¶ 24.  Again, however, no contractual addenda or amendments to the SDLA were

20  executed.  *Id.*  For Intelligraphics' work on the Motorola Project Marvell issued purchase orders in

21  $20,000.00 increments and paid Intelligraphics against those purchase orders.  *Id.*

22         In December 2006, Marvell employees Mahesh Venkantramin and Bart Giordano contacted

23  Intelligraphics and orally declared that work on the Motorola Project could not exceed $100,000.00.

24  *Id.*  At that point, Intelligraphics had already performed $80,000.00 of work on the project.  *Id.*

25  Intelligraphics, in turn, informed Marvell that it could not finish the project under this cap and that it

26  would stop work if Marvell refused to pay for work actually performed.  FAC, ¶ 25.  In January and

27  February of 2007, Marvell's Alan Cunningham verbally told Intelligraphics that Marvell would

28  continue to pay for work on the Motorola Project on a time and materials basis up to Intelligraphics'

United States District Court

For the Northern District of California

1   estimated total of $126,000.00.  *Id.*  Cunningham confirmed the same in an email dated January 22,

2   2007.  *Id.*  Relying on these assurances, Intelligraphics continued to perform work and turn over

3   source code to Marvell, ultimately performing $122,273.98 in work on the project.  *Id.*  However,

4   Marvell refused to pay beyond the $100,000.00.  *Id.*

5          In the meantime, Intelligraphics was working on the Vista,  Advanced Roaming and CCX

6   projects, for which Intelligraphics reported and billed Marvell all together.  FAC, ¶ 26.  When total

7   development fees, on a time and materials basis, began to approach $250,000.00, Intelligraphics

8   contacted Marvell to obtain authorization to work beyond the $250,000.00 cap.  *Id.*  Marvell's Bart

9   Giordano orally asked Intelligraphics to continue work on the Advanced Roaming and CCX Projects

10  without waiting for a new amendment and represented that Marvell would continue to pay

11  Intellligraphics for work on the projects even though the cost was going to exceed $250,000.00.  *Id.*

12  Based on these representations, Marvell continued to work on the Advanced Roaming and CCX

13  Supplicant Projects and turned over a version of the source code for the Advanced Roaming Project.

14  *Id.*

15         However, at a meeting in March 2007, Marvell's Sameer Bindichani refused to pay beyond

16  the $250,000.00 cap.  FAC, ¶ 27.   In fact, Intelligraphics alleges, Marvell paid only $201,555.88.

17  *Id.*  According to Intelligraphics, Bindichani took the position that Intelligraphics had no contract for

18  the Advanced Roaming Project and, therefore, could not collect for its work on that project.  *Id.*

19  Subsequently, Marvell asserted, through its counsel, that the $250,000.00 cap applied "not only to

20  the entire CCX project (CCX Advanced Roaming and CCX Supplicant work) but to the earlier

21  [Advanced Roaming] work as well."  *Id.*

22         According to Intelligraphics, Marvell failed to pay over $362,000.00 for work performed by

23  Intelligraphics.  *Id.*  Intelligraphics further alleges that Marvell is shipping the Advanced Roaming

24  software (with embedded CCX features) to Marvell's customers as part of its wireless

25  communications cards and has obtained significant profits from sales of Intelligraphics' copyrighted

26  Advanced Roaming software.  Similarly, Intelligraphics alleges, Marvell has not fully paid the

27  Development Fee for the Motorola Project software that was delivered to Marvell and Marvell is, as

28  a result, obtaining significant profits from sales of  Intelligraphics' copyrighted custom software for

1    the Motorola project.  FAC, ¶ 29.  According to Intelligraphics, it has registered copyrights in the

2    Motorola Project VRTX Ported 802.11 driver code and in the Advanced Roaming software.  FAC, ¶

3    30.

4        Based on the factual allegations summarized above, Intelligraphics asserts the following

5    seven claims: 1) breach of contract; 2) breach of implied contract; 3) fraud in the inducement;

6    4) fraud; 5) declaratory relief – equitable estoppel; 6) copyright infringement under 17 U.S.C. §§

7    101 *et seq.*; and 7) quantum meruit.

8        Intelligraphics' claim for fraud in the inducement (Claim 3) is based on the allegation that

9    Marvell intentionally made its promise to pay all Development Fees on a time and materials basis

10    for development and delivery of the Vista, Advanced Roaming and Hourly CCX V.4 Funk

11    Supplicant Development software and to negotiate in good faith any contractual amendments

12    necessary to facilitate such payment without any intent to perform.  FAC, ¶ 44.  Similarly,

13    Intelligraphics alleges, Marvell intentionally promised to pay all Development Fees on a time and

14    material basis for the development and delivery of the custom software to be created in the Motorola

15    Project without any intention to perform.  FAC, ¶ 45.  Intelligraphics alleges that it reasonably relied

16    on these promises "to enter into the SDLA, Amendment 3 and the agreement to pay for the

17    development of the Advanced Roaming software and the Motorola project software on the same

18    basis as set forth in Amendment 3 and to commence and continue work on these software

19    development projects in an effort to complete them."  FAC, ¶ 46.  Marvell's true intention in making

20    these promises, Intelligraphics alleges, was to attempt to avoid payment for a substantial part of

21    Intelligraphics' work on the projects while still demanding delivery of the software.  FAC, ¶ 48.

22        Intelligraphics' copyright infringement claim (Claim 6) is based on the allegation that

23    Marvell's incorporation of Intelligraphics' "copyrighted Advanced Roaming Software and its

24    Motorola development project software into its microchips and marketing and selling these

25    microchips . . . without making the payment of all Development Fees incurred for such work on a

26    time and materials basis necessary to the effective purchase of INTELLIGRAPHICS' intellectual

27    property rights with regard to such software – constitute infringement of INTELLIGRAPHICS'

28    copyrights."  FAC, ¶ 68.

United States District Court
For the Northern District of California

**B.      The Counterclaims**

On July 6, 2007, Marvell filed an answer to Intelligraphics' First Amended Complaint and asserted the following three counterclaims: 1) breach of contract based on the SDLA and Attachments 1 and 2 to Amendment 3 to the SDLA; 2) fraud in the inducement based on the allegation that Intelligraphics promised to complete all work under Amendment 3 to the SDLA for $250,000.00 without any intention of performing; 3) rescission under California Civil Code § 1689.

**C.      The July 28, 2008 Order**

In its July 28, 2008 Order, the Court ruled on two motions by Defendant Marvell: 1) a motion for judgment on the pleadings that Intelligraphics' copyright claim was insufficient, as a matter of law, because the alleged acts of copyright infringement fell within the scope of the license from Intelligraphics provided for in the SDLA; and 2) a motion for summary judgment on Intelligraphics' fraudulent inducement claim on the basis that the alleged false promise that Intelligraphics asserts induced it to enter into Amendment 3 – namely, the promise to pay all Development Fees earned on a time and material basis notwithstanding the $250,000.00 payment cap – could not be considered under the parol evidence rule because it contradicts the terms of the written contract.  Marvell further asserted with respect to the fraudulent inducement claim that Intelligraphics could not have reasonably relied on the alleged promise.

With respect to the copyright claim, the Court held that  the language of the SDLA was ambiguous as to whether it created a nonexclusive license with respect to the Custom Software and therefore that judgment on the pleadings as to Claim 6 was inappropriate.

The Court also denied Marvell's motion for summary judgment as to the fraudulent inducement claim.  In particular, the Court held that the parol evidence rule did not apply.  The Court also rejected Marvell's reasonable reliance argument on the basis that Marvell had expressly stipulated, for the purposes of the summary judgment motion, that reliance was reasonable.

**D.      The November 10, 2008 Stipulation**

On November 10, 2008, the parties filed a stipulation that Marvell does not infringe Intelligraphics' copyright with respect to the Advanced Roaming Software.  As a result, Intelligraphics' remaining copyright claim (Claim 6) is based only on the Motorola Software.

**United States District Court**
For the Northern District of California

**E.      The Motions**

Marvell now brings three summary judgment motions, seeking summary judgment on Intelligraphics' claims for fraudulent inducement (Claim 3), fraud (Claim 4), copyright (Claim 6) and Quantum Meruit (Claim 7).  Intelligraphics, in turn, brings a motion for summary judgment that Marvell may not recover lost profits due to alleged lost sales on its first and second counterclaims, for breach of contract and fraud.

## III.      LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  In order to prevail, a party moving for summary judgment must show the absence of a genuine issue of material fact with respect to an essential element of the non-moving party's claim, or to a defense on which the non-moving party will bear the burden of persuasion at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Further, "*Celotex* requires that for issues on which the movant would bear the burden of proof at trial, that party must show affirmatively the absence of a genuine issue of material fact," that is, "that, on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir.1993).  Once the movant has made this showing, the burden then shifts to the party opposing summary judgment to designate "specific facts showing there is a genuine issue for trial." *Id.* at 323.  On summary judgment, the court draws all reasonable factual inferences in favor of the non-movant. *Anderson v. Liberty Lobby Inc.,* 477 U.S. 242, 255 (1986).

## IV.      FRAUDULENT INDUCEMENT SUMMARY JUDGMENT MOTION

**A.      Arguments**

Marvell seeks summary judgment on Intelligraphics' fraudulent inducement claim on the basis that Intelligraphics could not have reasonably relied on representations by Marvell's in-house counsel, Carrie Le Roy, that Marvell would pay *all* of Intelligraphics' development fees on a time a materials basis despite the $250,000.00 payment cap in Amendment 3 to the SDLA.  Marvell cites to

United States District Court

For the Northern District of California

California case law holding that parties to a contract may not rely on representations of an opposing party regarding the meaning of contract terms where those representations contradict the express language of the contract. *See, e.g. Western Hospitals Federal Credit Union v. E.F. Hutton & Co., Inc.*, 700 F. Supp. 1039, 1041 (N.D. Cal. 1988).   Marvell also notes that the Court, at oral argument on Marvell's prior motion for judgment on the pleadings on Claim 3, said that it was "prepared to hold" that a party to a contract is not entitled to rely on advice from the other side about the meaning of the contract.  The Court, Marvell points out, stated that it was denying the motion for judgment on the pleadings because Marvell had stipulated, for the purposes of that motion, that Intelligraphic's reliance was reasonable.  It recognized, however, that that stipulation would not apply to any future motion for summary judgment on the question, which the Court expressly permitted Marvell to file after the close of discovery.

Intelligraphics asserts in its Opposition that summary judgment should not be entered on Claim 3 because there is evidence – obtained three months after the hearing on Marvell's prior motion – that representations about Marvell's intention to pay development fees beyond the $250,000.00 cap were made not only by Marvell's counsel but also by its chief business negotiator and Product Manager on the relevant software products, Bart Giordano.  In particular, Intelligraphics president Scott Lawson testified at his October 7, 2008 deposition that he recalled that both Bart Giordano and Carrie LeRoy assured him during negotiation regarding the payment cap that the language did not mean the contract was a fixed price contract but rather, it was understood that it was a time and materials contract.  Declaration of Frank Sommers in Opposition to Defendant's Motion for Summary Judgment ("Sommers Opposition Decl."), Ex. H (Deposition of Scott Lawson, October 7, 2008) at 218.  According to Lawson, both LeRoy and Giordano assured him that if the $250,000.00 figure was reached, Intelligraphics "could stop work – or perhaps Marvell would take this work in-house or do something else, or we could agree that they would provide more money and then we would continue working." *Id.* at 219-220.  When asked whether these statements were made by LeRoy or Giordano, Lawson testified that he could not recall "specifically who said what." *Id.* at 219.  Intelligraphics asserts that this evidence shows that Giordano made promises –

United States District Court

For the Northern District of California

1   independent of Marvell's counsel's representations regarding the meaning of the contract term –

2   that preclude summary judgment on Claim 3 and the question of reasonable reliance.

3        In response, Marvell argues that it is entitled to summary judgment on Claim 3 for the

4   following reasons.  First, Marvell argues that whether the statements Intelligraphics asserts it relied

5   upon in entering the contract were made by its in-house counsel or its product manager is

6   immaterial; either way, Intelligraphics was not entitled to rely on those representations.   Second,

7   Marvell argues that there is no evidence in the record that Giordano even made any statements on

8   which Intelligraphics could have relied because Lawson could not remember whether the statements

9   cited by Intelligraphics were made by LeRoy or Giordano.  Third, when Marvell asked Lawson, who

10   had been designated as a 30(b)(6) witness by Intelligraphics, whether Intelligraphics relied on the

11   statements (whether by LeRoy or Giordano) in entering into the agreement, Intelligraphics' counsel

12   instructed Lawson not to answer.  As a result, Marvell asserts, Intelligraphics may not now rely on

13   Lawson's testimony to establish a fact question as to reasonable reliance.  Fourth, Marvell rejects

14   Intelligraphics' argument that Giordano's statements, as described by Lawson, constituted

15   "independent" promises above and beyond the representations made by LeRoy regarding contract

16   interpretation.  Rather, Marvell asserts, Giordano's statements, like LeRoy's, related to the payment

17   cap provision.

18   **B.**       **Analysis**

19        In the Court's July 28, 2008 Order addressing the question of reasonable reliance, it stated as

20   follows:

21          One of the elements of fraudulent inducement is reasonable reliance on the alleged
           misrepresentations. *Kahn v. Lischner*, 128 Cal. App. 2d 480, 489 (1954) ("The test is not

22          only whether the party acted in reliance on a misrepresentation, but whether he was justified
           in his reliance").  "Except in the rare case where the undisputed facts leave no room for a

23          reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable
           is a question of fact." *OCM Principal Opportunities Fund v. CIBC World Markets, Corp.*,

24          157 Cal. App. 4th 835, 864 (2007).  California courts have, however, in a handful of cases,
           held as a matter of law that reliance on the representations of opposing counsel on legal

25          questions was not reasonable.  *See, e.g., Wilhelm v. Pray, Price, Williams & Russell*, 186
           Cal. App. 3d 1324, 1332 (1986) (holding that plaintiff who had her own attorney dismiss

26          separate action based on representations by opposing counsel could not, as a matter of law,
           show reasonable reliance); *Rowland v. PaineWebber Inc.*, 4 Cal. App. 4th 279, 286 (1992)

27          (holding that where plaintiffs asserted fraudulent inducement claim based on representation
           by investment management company that plaintiffs did not need to read written agreement

28          containing arbitration clause, plaintiffs could not reasonably rely on that representation in

seeking to avoid the arbitration clause); *Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287 (1988) (holding that plaintiffs could not avoid arbitration clause based on allegation that defendant fraudulently misled them by failing to inform them of the meaning and effect of an arbitration clause in a written agreement and stating, "[w]e know of no case holding that parties dealing at arm's length have a duty to explain to each other the terms of a written contract"), overruled on other grounds, *Ticknor v. Choice Hotels Int'l, Inc.*, 265 F.3d 931, 941 (9th Cir. 2001); *West. Hosps. Fed. Credit Union v. E.F. Hutton & Co., Inc.*, 700 F. Supp. 1039, 1041 (following *Cohen,* holding that plaintiff could not avoid arbitration based on allegation that defendant had fraudulently induced plaintiff to sign agreement containing arbitration clause by affirmatively stating that the agreement was merely "paperwork" and would not affect the plaintiff's legal rights).

July 28 Order at 18-19.

Intelligraphics now asserts that the Court's holding was limited to statements by attorneys and did not extend to other representatives of a company. Intelligraphics is incorrect. The Court framed the discussion in terms of reliance on statements by opposing counsel because, at the time of the motion, there was no allegation that Intelligraphics had relied on statements made by anyone other than Marvell's counsel, Carrie LeRoy. The rationale for the Court's holding, however, applies equally to a representative of a company involved in contract negotiations, as is apparent from the Court's parantheticals describing the holdings of the cases on which it relied. In particular, these cases are based on the principal that parties dealing at arms length do not have a duty to explain the terms of a written contract. *See Cohen v. Wedbush, Noble, Cooke, Inc.*, 841 F.2d 282, 287 (1988). Thus, "[c]ontracts made at arm's length between experienced business people should be honored by the parties and enforced by the courts," at least where the written terms are clear. *See Rowland v. PaineWebber Inc.*, 4 Cal. App.4th 279, 286 (1992 ). Those principles apply here. The statements to which Lawson testified were not independent promises but rather, constituted representations regarding the meaning of a contract provision. As such, Intelligraphics could not reasonably rely on them, regardless of whether they were made by LeRoy or Giordano.[3]

The Court GRANTS summary judgment on Claim 3, for fraudulent inducement, which is dismissed with prejudice.

---

[3]Because Marvell is entitled to summary judgment on the basis that Intelligraphics could not reasonably rely on statements by Giordano, the Court declines to reach Marvell's remaining arguments.

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

## V.    COPYRIGHT SUMMARY JUDGMENT MOTION

### 1.    Arguments

Marvell argues that Intelligraphics' copyright claim, which is now based upon only the Motorola software, should be dismissed on summary judgment for the following reasons.  First, Marvell argues that only Motorola used the software at issue (not Marvell) and Motorola had an implied license to use the software, citing *Effects Associates v. Cohen*, 908 F.2d 555 (9th Cir. 1990) and *Asset Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748 (9th Cir. 2008).  Second, Marvell asserts that to the extent Marvell itself may have assisted Motorola in testing the software, Marvell had an express license to do so under Section 3.2 of the SDLA, entitled "Acceptance Testing."[4]  Third, Marvell argues that to the extent Intelligraphics' claim is based on the allegation that Marvell hasn't paid all of the development fees for the Motorola software and therefore, ownership of the copyright to that software has not transferred to Marvell under Section 6.1(a) of the SDLA, the claim fails because Marvell tendered payment for the Motorola software after this action was filed and that payment was refused.[5]

---

[4]Section 3.2 of the SDLA provides as follows:

**3.2** 

[5]Section 6.1(a) of the SDLA provides as follows:

**6.1**

United States District Court

For the Northern District of California

1    In its Opposition, Intelligraphics rejects Marvell's assertion that it did not "use" the Motorola

2    software, arguing that because Marvell instructed Intelligraphics to transfer the software to

3    Motorola, Motorola was an "agent" of Marvell with respect to use and therefore, can be held liable

4    for copyright violations arising from Motorola's use of the software.  Intelligraphics points in

5    particular to testimony by Alan Cunningham, Marvell's chief field engineer on the Motorola project,

6    that "Intelligraphics delivered everything on [the Motorola] project as specified."  Sommers

7    Opposition Decl., Ex. A (Cunningham Depo.) at 138.

8    Intelligraphics further asserts that there was no implied license.  In particular, Intelligraphics

9    argues that *Effects Associates* does not apply because the implied license in that case arose where the

10   there was no contractual provision between the owner of the intellectual property and the recipient.

11   Under the circumstances of that case, the court found that a license was implied, but the court noted

12   that the result would have been different had there been a "black and white" agreement between the

13   parties governing ownership of  intellectual property.  908 F.2d at 557.   Marvell argues that in this

14   case, there is such a "black and white" agreement, pointing to Section 6.1(a) of the SDLA,

15   governing ownership of the intellectual property rights to the Custom Software. Section 6.1(a)

16

17

18

19

20   _____

21   (a)



. . . .

14

United States District Court

For the Northern District of California

1  provides that intellectual property rights in the Custom Software are transferred to Marvell when the

2  development fee has been paid.[6]

3       With respect to the existence of an express license, Intelligraphics asserts that the provision

4  that governs testing licenses on which Marvell relies, Section 3.2 of the SDLA, does not apply to the

5  Motorola Software and that at least, the facts are in dispute as to whether it applies.  Intelligraphics

6  asserts that there were no Milestone Deliverables as to the Motorola project and that the parties

7  never followed the acceptance procedure set forth in Section 3.2 with respect to the Motorola

8  software.

9       Finally, Intelligraphics argues that Marvell's tender of the development fees after litigation

10  began does not defeat it's copyright claim because Marvell had already breached the contract and

11  further, the contract is not divisible.  Thus, Intelligraphics asserts, it was not required to perform,

12  under the contract, until Marvell paid the outstanding development fees for all of the projects at

13  issue, that is, the development fees for the Advanced Roaming, Vista and CCX software as well as

14  the fees for the Motorola software.

15       In its Reply, Marvell reiterates that there is no evidence that Marvell used the Motorola

16  software and therefore, Intelligraphics cannot establish that Marvell violated any of  Intelligraphics'

17  rights under copyright law.  Even if Marvell did use the software, for example, by passing it on to

18  Motorola, that use would not constitute a copyright violation. Marvell further argues that

19  Intelligraphics will not be able to remedy this shortcoming at trial, noting that Intelligraphics'

20  30(b)(6) witness refused to answer, on the basis of attorney-client privilege, when asked to identify

21  the specific acts of copyright infringement on which Intelligraphics' claim is based. *See* Reply

22  Declaration of Michael Molano ("Molano Reply Decl."), Ex. 5 (Lawson Depo.) at 44-53.  Marvell

23  also rejects the assertion that Motorola's use constitutes a copyright infringement, arguing that under

24  *Effects Associates* and *Asset Marketing*, Motorola had an implied license to use the software at issue.

25  Marvell points out that it is undisputed that Intelligraphics never told Motorola to stop using the

26  copyrighted Motorola code.  Joint Statement, ¶ 12.  With respect to the existence of an express

27

28       [6]The parties agree that they both considered that the Motorola Project work was covered by the provisions of the SDLA.  *See* Joint Statement of Facts on Motions for Summary Judgment ("Joint Statement"), ¶ 11.

1   license, Marvell once again asserts that Section 3.2 applies to the Motorola software, arguing that

2   that section covers not only Milestone Deliverables but also Custom Software.

3       Marvell does not respond to Intelligraphics' argument that it was not required to accept

4   Marvell's tender of payment for the Motorola software.

5       **2.      Analysis**

6           **a.      Existence of an Implied License**

7       Marvell asserts that it is entitled to summary judgment on Intelligraphics' copyright claim

8   because the software on which it was based, which was developed by Intelligraphics for the

9   Motorola Project, was used only by Motorola and Motorola had an implied, non-exclusive license to

10  use that software.  The Court agrees.

11      Under 17 U.S.C. § 501(b), a copyright owner may bring an action for any infringement of the

12  copyright.  A copyright owner who has granted a nonexclusive license to the copyrighted material,

13  however, waives the right to sue for copyright infringement unless the licensee acts outside of the

14  scope of the license.  *Sun Microsystems, Inc. v. Microsoft*, 188 F.3d 1115, 1121 (9th Cir. 1999).  A

15  copyright owner may grant a nonexclusive license expressly or impliedly through conduct.  *Asset*

16  *Marketing Systems, Inc. v. Gagnon*, 542 F.3d 748, 754 (9th Cir. 2008).   In *Asset Marketing*, the

17  plaintiff was a contractor who created software at the request of the defendant company.  *Id.* at 750.

18  Although the software was provided under a contract between the parties, the contract did not

19  mention a license.  *Id.*  Nonetheless, the court held, on summary judgment, that an implied license

20  had been granted.  *Id.*

21      The court in *Asset Marketing* held that an implied license is granted when "'(1) a person (the

22  licensee) requests the creation of a work, (2) the creator (the licensor) makes that particular work

23  and delivers it to the licensee who requested it, and (3) the licensor intends that the

24  licensee-requestor copy and distribute his work.'" *Id.* (quoting *I.A.E., Inc. v. Shaver*, 74 F.3d 768,

25  776 (7th Cir.1996) (citing *Effects*, 908 F.2d at 558-59)).  It explained that "[t]he relevant intent is the

26  licensor's objective intent at the time of the creation and delivery of the software as manifested by

27  the parties' conduct." *Id.* at 756.  Drawing on authority from the First and Fourth Circuits, the court

28  set forth the following factors in determining whether the licensor intended to grant a license:

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

> 1) whether the parties were engaged in a short-term discrete transaction as opposed to an ongoing relationship; (2) whether the creator utilized written contracts ... providing that copyrighted materials could only be used with the creator's future involvement or express permission; and (3) whether the creator's conduct during the creation or delivery of the copyrighted material indicated that use of the material without the creator's involvement or consent was permissible.

*Id.* (quoting *John G. Danielson, Inc. v. Winchester-Conant Props., Inc.*, 322 F.3d 26, 41 (quoting *Nelson-Salabes, Inc. v. Morningside Dev.*, LLC, 284 F.3d 505, 516 (4th Cir.2002)).  Considering these factors, the court in *Asset Marketing* concluded that the contractor had granted an implied, non-exclusive license to the defendant, citing in particular to the contract under which the contractor promised to provide the software, which contained no language suggesting an intent to retain control over the intellectual property rights to the software, and the fact that the contractor had "delivered the software without any caveats or limitations." *Id.* at 756-757.   The court also noted that because the contract was due to expire soon, it would have made no sense for the defendant to pay the contractor for software that it would lose the right to use in within a short time, thus further supporting the conclusion that the contractor had granted an implied license. *Id.*

    In *Asset Marketing*, the Ninth Circuit relied on an earlier decision, *Effects Associates v. Cohen*, 908 F. 2d 555, 558 (9th Cir. 1990).  In that case, a movie producer hired Effects Associates to create certain special effects for a movie. *Id.* at 555-556.  Effects Associates offered to create the special effects in a short letter ("the Agreement Letter") and the producer agreed to the offer orally. *Id.*   There was no discussion of who would own the copyright to the footage containing the special effects. *Id.*  The producer was unhappy with the special effects and paid Effects Associates only half of the agreed amount. *Id.* at 556.  Nonetheless, he included the special effects in the film and turned it over to New World Entertainment for distribution. *Id.*  Subsequently, Effects Associates sued the producer for copyright infringement. *Id.*  The court granted summary judgment on the copyright claim, however, on the basis that Effects Associates had granted a non-exclusive license to the producer to use the special effects in his film. *Id.* at 558-559.  In reaching this conclusion, the court relied on the letter offer by Effects Associates, which showed that the parties understood the special effects would be used in the film. *Id.* at 558 n.6. It also cited to the fact that Effects Associates had delivered the negatives of the film to the producer, noting that while delivery of the copyrighted

United States District Court

For the Northern District of California

1   work is not sufficient, by itself, to give rise to an implied license, it is a factor that may be

2   considered in determining whether an implied license has been granted. *Id.* The court rejected

3   Effects Associates' assertion that full payment for the special effects was a condition precedent to an

4   implied license, noting that the Agreement Letter did not state that failure to pay would be viewed as

5   a copyright violation and Effects Associates' president also testified that this was nothis

6   understanding. *Id.*

7        Here, the undisputed facts support the conclusion that Motorola had an implied license to test

8   the copyrighted software at issue. Intelligraphics created the software with the understanding it

9   would be given to Motorola for testing. Intelligraphics delivered the software to Motorola without

10  imposing any limitations on its use. Intelligraphics did not ever tell Motorola to stop using the

11  software. Joint Statement, ¶ 12. In addition, the provisions of the SDLA – which the parties agree

12  they understood applied to the Motorola Project work (Joint Statement, ¶ 11) – also support the

13  conclusion that Intelligraphics intended to grant an implied license to Motorola, at least for the

14  purposes of testing the software. In particular, Section 3.2 expressly permitted acceptance testing,

15  envisioning that custom software would be provided to OEM's and ODM's for "evaluation and

16  testing." There is no evidence that Motorola exceeded this scope.

17       The Court rejects Intelligraphics' assertion that the SDLA makes it clear that Intelligraphics

18  did *not* intend to grant an implied license to Motorola. Intelligraphics points, in particular, to section

19  6.1 of the SDLA in support of its position. That section addresses *ownership* of the copyrights to

20  custom software, however, not whether an OEM or ODM who receives custom software for testing

21  is granted a non-exclusive, implied license. Further, the SDLA, like the agreement in *Effects*

22  *Associates*, does not state that failure to pay development fees on the part of Marvell will be viewed

23  as a copyright violation, either on the part of Motorola or Marvell. Therefore, no condition

24  precedent can be found that would defeat a finding that Motorola had an implied license to use the

25  custom software that was created for it and delivered to it by Intelligraphics.

26       Finally, to the extent that Motorola had an implied license to use the software Intelligraphics

27  provided to it, Marvell cannot be liable for copyright infringement on the basis of that use. *See*

28  *Lewis Galoob Toys, Inc. v. Nintendo of America, Inc.*, 964 F.2d 965, 970 (9th Cir. 1992). Therefore,

1    to the extent Intelligraphics' claim is based on Marvell's role in authorizing Motorola's use of the

2    Intelligraphic software, that claim fails as a matter of law.

3                    **b.      Existence of an Express License**

4            The Court further concludes that to the extent that there is any evidence that Marvell itself

5    used the Motorola project software – and the evidence of that is scant[7] – that use is covered by the

6    express terms of the SDLA itself.  In particular, Section 3.2 provides that Marvell shall "evaluate

7    and test the . . . Custom Software."  Intelligraphics has conceded that this language gives Marvell a

8    license to test the Custom Software.  *See* Docket No. 58 at 5 (stating that sections 3.2 would provide

9    "a full defense to any claim that Marvell did not have a license to test its new product").   As there

10   no evidence that Marvell's use of the Motorola Project software exceeded the scope of the express

11   license in Section 3.2, Marvell is entitled to summary judgment on Intelligraphics' copyright claim.[8]

12   **VI.    FRAUD/QUANTUM MERUIT SUMMARY JUDGMENT MOTION**

13                   **1.      Arguments**

14           Marvell asserts that it is entitled to summary judgment on Intelligraphics' claims for fraud

15   (Claim 4) and Quantum Meruit (Claim 7).  As to the fraud claim Marvell invokes California's

16   economic loss rule, which limits the ability of a plaintiff to recover in tort for economic losses that

17   result from disappointed expectations with respect to goods or services provided under a contract.

18   Marvell cites to *Robinson Helicopter Co., Inc. v. Dana Corp.*, 34 Cal. 4th 979 (2004).   Marvell

19   argues that the Quantum Meruit claim also should be dismissed, citing to cases that hold that under

20   California law, there cannot be a valid express contract and an implied contract on the same subject

21

22           [7]The evidence cited by Intelligraphics on this question is the deposition testimony of the Marvell
     field engineer who coordinated with Motorola, Alan Cunningham, who testified that Marvell "continued
23   to support the field trials [by Motorola using the copyrighted software] through December 2007."
     Sommers Opposition Decl., Ex. A (Cunningham Deposition Testimony) at 133.  It is not stated what
24   form this "support" took.

25           [8]Because the Court concludes that the testing of the Motorola software was permissible under
     both an express and implied license, the Court need not reach the question of whether the evidence of
26   "use" is sufficient to support a finding that Intelligraphics' copyright was infringed.   The Court notes,
     however, that it has found no authority to support Intelligraphics' argument at the hearing that
27   Motorola's copying of the Intelligraphics' software from a secure website, while authorized at the time
     of the copying, was converted, retroactively, to a copyright violation when Marvell failed to pay
28   Intelligraphics for its work.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1  matter.  *See, e.g., Berkla v. Corel Corp.*, 302 F.3d 909 (9th Cir. 2002).

2      Intelligraphics rejects the assertion that the economic loss rule bars its fraud claim, arguing

3  that that doctrine does not preclude fraud claims that are based on new promises to pay without

4  intent to perform.  Intelligraphics cites to a declaration by its CEO, Scott Lawson, stating that in late

5  2006, he discussed terminating work on the Motorola project several times but decided to continue

6  working on the contract based on promises by Marvell that it would pay the outstanding

7  development fees.  Declaration of Scott Lawson in Support of Intelligraphics, Inc.'s Opposition to

8  Motions for Partial Summary Judgment ("Lawson Opposition Decl."), ¶ 4.  According to Lawson,

9  but for these promises, Intelligraphics would have stopped working on the Motorola project on

10  October 31, 2006.[9]  Intelligraphics asserts that because it continued to work on the Motorola project

11  after October 31, 2006, it incurred $187,370.63 in contract damages that it would not have incurred

12  otherwise.

13      In addition to the Lawson Declaration, Intelligraphics cites to deposition testimony by

14  Marvell's Bart Giordano and Intelligraphics' Steve Dearden as evidence that separate promises were

15  made to pay development fees above the payment cap in Amendment 3 to the SDLA.

16      With respect to the Quantum Meruit claim, Intelligraphics argues that it should be allowed

17  to proceed on that claim as an alternative theory of recovery should it be found that an express

18  contract did not exist, for example, as to the Advanced Roaming project work.

19      In its Reply, Marvell asserts that the Lawson Declaration constitutes new evidence that is

20  inadmissible because it was not included in Intelligraphics' initial disclosures relating to damages,

21  and it contradicts both its prior interrogatory responses and the deposition testimony of Scott

22  Lawson.

23      With respect to initial disclosures, Marvell invokes Federal Rule of Civil Procedure

24  26(a)(1)(A)(iii), which requires that parties provide "a computation of each category of damages."

---

25
26      [9]In both the Lawson Declaration and in the Opposition, Intelligraphics refers to dates in 2008.
   In particular, Lawson states that Intelligrpahics would have stopped working on the Motorola project
27  on October 31, 2008 but for the alleged fraud by Marvell re payment.  In the brief, Intelligraphics refers
   to a promise made by Giordano on November 30, 2008 to make a payment on the Motorola work.
28  Based on the evidence and argument presented by Intelligraphics elsewhere, the Court concludes that
   these are typographical errors and that these are references to 2006.

United States District Court

For the Northern District of California

Intelligraphics did not provide a separate computation of damages for its fraud and contract claims in its Initial Disclosures. Rather, it simply stated a single amount of damages it was seeking. *See* Molano Reply Decl., Ex. 7. As to the interrogatory responses, Marvell cites to Intelligraphics' response to an interrogatory asking for all evidence supporting its fraud claim in which it merely incorporated by reference the evidence provided to support its contract claim. *See* Joint Statement, ¶¶ 6, 7 & 17. Finally, Marvell points to Lawson's deposition testimony, which it asserts contradicts Lawson's declaration.

In his deposition, Lawson, as a 30(b)(6) witness, was asked to distinguish between Intelligraphics' damages on various claims, including its fraud and contract claims. Molano Reply Decl., Ex. 9 at 27. In response, Intelligraphics' counsel invoked attorney-client privilege, instructing Lawson to respond only if he had an independent understanding of the question. *Id.* Lawson stated that he had no independent understanding on this question. *Id.* Because Lawson did not disclose the damages computation contained in his declaration, Marvell asserts, Intelligraphics may not now rely on that declaration to create a fact question on summary judgment.

Even if the Lawson Opposition Declaration is admissible, Marvell argues, the promises on which Intelligraphics relies are merely reaffirmations of existing contractual duties that cannot give rise to a separate tort claim.

With respect to the Quantum Meruit claim, Marvell argues that although parties may assert claims based on alternative theories at the pleading stage, it is too late in the case to advance theories based on inconsistent factual positions. According to Marvell, to the extent Intelligraphics alleged that all of its work was performed pursuant to an agreement, it cannot now assert that the work was *not* governed by an agreement.

### 2. Analysis

#### a. Fraud Claim

Marvell argues that Intelligraphics' fraud claim is no more than a restatement of its contract claim; it argues that the damages sought on the two claims are the same and that the fraud claim is not based on any separate duty that could give rise to tort liability. The Court agrees.

In *Robinson Helicopter*, the California Supreme Court explained that "the economic loss rule

United States District Court

For the Northern District of California

prevents the law of contract and the law of tort from dissolving one into the other." 34 Cal. 4th at 988 (citation omitted).  It "requires a purchaser to recover in contract for purely economic loss due to disappointed expectations, unless he can demonstrate harm above and beyond a broken contractual promise." *Id.*  The economic loss rule does not apply where a claim is based upon a duty that exists independent of the contract and arises from principles of tort law.  *Id.*  Thus, a tort claim may be permitted in a contract case where there has been intentional conduct associated with the breach or where the breach directly causes physical injury.  *Id.*

In *Robinson Helicopter*, a helicopter manufacturer (Robinson) sued a supplier of helicopter parts (Dana), asserting both fraud and breach of contract claims.  The case involved the provision of a part called a "sprag clutch" to Robinson by Dana.  *Id.* at 987.  Robinson had purchased sprag clutches from Dana for several years, and the specifications for that part had been incorporated into the "type certificate" from the Federal Aviation Administration ("FAA"), which freezes the design of the helicopter as of the date the certificate is issued.  *Id.*  At some point Dana changed its process of manufacturing the part, the result of which was that the part no longer conformed to the "type certificate" issued by the FAA.  *Id.*  Dana did not reveal the change to Robinson, however, and continued to issue certificates to Robinson stating that the parts *did* conform to Robinson's written specifications.  *Id.*  Eventually, Dana switched back to the original manufacturing process, but the parts that were manufactured in the interim began to fail at a high rate.  *Id.*  Dana initially denied responsibility and Robinson was forced to recall and replace the faulty sprag clutches, at significant expense.  *Id.*  It sought to replace the clutches as quickly as possible to avoid potential accidents that might result from the faulty parts.  *Id.*

Robinson's fraud claim against Dana was based on the allegation that Dana intentionally provided false certificates of conformance during the period in which the faulty sprag clutches were manufactured, that it relied on the certificates and that as a result, it was harmed.  *Id.*  Dana asserted that the claim was barred under the economic loss rule, but the California Supreme Court disagreed, explaining its reasoning as follows:

> By issuing false certificates of conformance, Dana unquestionably made affirmative representations that Robinson justifiably relied on to its detriment. But for Dana's affirmative misrepresentations by supplying the false certificates of conformance, Robinson would not

United States District Court

For the Northern District of California

1   have accepted delivery and used the nonconforming clutches over the course of several
2   years, nor would it have incurred the cost of investigating the cause of the faulty clutches.
    Accordingly, Dana's tortious conduct was separate from the breach itself, which involved
3   Dana's provision of the nonconforming clutches. In addition, Dana's provision of faulty
    clutches exposed Robinson to liability for personal damages if a helicopter crashed and to
    disciplinary action by the FAA. Thus, Dana's fraud is a tort independent of the breach.

4

5   *Id.* The court further explained that this result supported California's public policy of punishing

6   intentional misrepresentations, which carry an "extra measure of blameworthiness" and therefore

7   merit an award of out-of-pocket damages in addition to benefit-of-the bargain damages. *Id.*

8          In *County of Santa Clara v. Atlantic Richfield Co.*, 137 Cal. App. 4th 292 (2006), on which

9   Intelligraphics relies in opposition to Marvell's motion, the court addressed the scope of the ruling in

10  *Robinson Helicopter*. There, the court addressed whether a fraud claim against lead paint

11  manufacturers who intentionally misrepresented that their product was safe was barred by the

12  economic loss rule where plaintiffs also asserted a strict products liability claim as to which they

13  alleged the same damages. *Id.* at 342.   The court held that the economic loss rule did not apply,

14  concluding that *Robinson* "precludes the application of the economic loss rule to any intentional

15  affirmative fraud action where the plaintiff can establish that the fraud exposed the plaintiff to

16  liability." *Id.* The court further explained that the potential liability that arose from the irremediable

17  physical harm to plaintiffs resulting from lead exposure went beyond the economic losses resulting

18  from the costs of prevention and treatment. *Id.*

19         Here, Intelligraphics asserts that there is evidence of promises that gave rise to an

20  independent duty that may be subject to a tort action.  The undisputed evidence does not support that

21  claim.  First, the Court rejects Intelligraphics' reliance on the Lawson Opposition Declaration to

22  establish the existence of such a duty because that declaration includes damage computations and

23  testimony that was not revealed in Intelligraphics' initial disclosures or interrogatory responses and

24  which contradicts Lawson's deposition testimony. *See Kennedy v. Allied Mutual Insurance Co.*, 952

25  F.2d 262, 266 (9th Cir. 1991)("a party cannot create an issue of fact by an affidavit contradicting his

26  prior deposition testimony").  Further, even if the Court found the declaration to be proper, it could

27  not rely on it as evidence that Marvell's Giordano promised Intelligraphics' Dearden that Marvell

28  would pay development fees above the $250,000.00 cap in Amendment 3.  The statement that

United States District Court

For the Northern District of California

1   Deardon told Lawson as much is double-hearsay and therefore inadmissible to establish that the

2   underlying promise was made.

3         Intelligraphics also cites to the deposition testimony of Steve Dearden, a new vice president

4   at Intelligraphics who was assigned to work on the projects with Marvell, as well as deposition

5   testimony of Bart Giordano, of Marvell.  In particular, Intelligraphics asserts that the following

6   promises were made to Intelligraphics in the fall of 2006:  1) "On November 20, 2006, Giordano

7   sent Dearden an -email about [Intelligraphics'] request for payment and an increase in the budgetary

8   cap.  Giordano told Dearden that he would get [Intelligraphics] the money and an amendment to the

9   contract;" Opposition at 3; 2) "Giordano also promised on November 30, 2008 [sic] that Marvell

10  would make a $100,000.00 payment soon to bring its total payment on these projects to $250,000 –

11  when the total billed on the projects had reached $256,202.73:" Opposition at 4; 3) "on December 8,

12  Giordano told Dearden that Marvell had authorized immediate payment for the $100,000."

13  Opposition at 4.

14        An examination of the evidence cited by Intelligraphics in support of these assertions reveals

15  that none of the alleged promises is anything more than a reiteration of the obligations that exist

16  under the contract.  First,  Intelligraphics does not provide the November 20 email in which

17  Giordano allegedly promised to "get Intelligraphics the money and an amendment to the contract."

18  Nor does the Dearden testimony cited in support of this assertion reveal any such promise.  *See*

19  Sommers Opposition Decl., Ex. J (Dearden Depo.) at 130-135.  Rather, from what can be gleaned

20  from the deposition testimony, it appears that Giordano stated in his November 20 email that a

21  purchase order for a payment of $100,000.00 "under the existing contract" was awaiting approval by

22  a general manager.  *Id.* at 131-132.  The email also apparently stated that "I won't be able to

23  convince anyone to pay you more money."  *Id.*

24        Similarly, the deposition testimony of Giordano, cited by Intelligraphics as evidence of

25  additional promises to perform, indicates only that Marvell was *considering* whether to approve

26  costs that exceeded the $250,000.00 cap.  *See* Sommers Opposition Decl., Ex. C (Giordano Depo.) at

27  233 ("I discussed the fact that I would review the justification that they had made for the cost

28  overrun with my senior management to see if they agreed with it and would be willing to go above

1   and beyond the previously agreed-to cap in the contract."). Further, in an email dated November 10,

2   2006, Giordano stated that the $100,000.00 purchase order was the amount that would "take

3   [Marvell] up to the cap." *Id.*

4        In short, there is no evidence in the record indicating that Marvell made any promises that it

5   would pay development fees that exceeded the payment cap in the contract. Indeed, even with

6   respect to Giordano's representations regarding payment of the $100,000 that was within the

7   contractual limit, the evidence is consistent that Giordano was waiting for approval of the payment.

8   The Court concludes that these representations are not sufficient to give rise to a duty that would be

9   outside the ambit of the economic loss rule. In contrast to *Robinson* and *County of Santa Clara*,

10  there is no evidence of misrepresentations that exposed Intelligraphics to liability beyond the

11  economic loss that allegedly resulted from Marvell's failure to abide by the terms of the contract.

12  Nor are the representations cited by Intelligraphics, which are, at most, assurances that Marvell

13  intended to meet its contractual obligations, sufficient to give rise to an "extra measure of

14  blameworthiness" or that constitute a "clear . . .deviation from socially useful business practices."

15  *Robinson*, 34 Cal. 4th at 988. Rather, were the Court to permit a fraud claim based merely on

16  representations that the defendant intended to make payments required under the contract, the Court

17  would open the door to tort claims in virtually every case in which a party promised to make

18  payments under a contract but failed to do so. Such a result would be inconsistent with the

19  reasoning offered by the California Supreme Court in *Robinson*.

20       For the reasons stated above, the Court GRANTS Marvell's summary judgment motion as to

21  the Claim 4, for fraud, which is dismissed with prejudice.

22            **b.    Quantum Meruit Claim**

23       Intelligraphics does not dispute that under California law, a defendant may not be held liable

24  for breach of an express contract and on a quasi-contractual theory based on the same contract.

25  Rather, it asserts that its Quantum Meruit claim should survive summary judgment because it

26  constitutes an alternative theory of liability with respect to work, such as the Advanced Roaming

27  work, as to which it may be found that there was no meeting of the minds and thus no valid express

28  contract. Marvell, in turn, does not dispute that alternative theories are allowable at the pleading

United States District Court

For the Northern District of California

1  stage but asserts that by the summary judgment stage of the case, plaintiffs are no longer permitted

2  to advance claims that are *factually* inconsistent.  According to Marvell, that is the case here because

3  Intelligraphics has already asserted, in its First Amended Complaint, that it acted pursuant to an

4  express contract with respect to all of the software it developed for Marvell.  The Court concludes

5  that Marvell is incorrect.  The existence of a valid contract is a mixed question of law and fact.  *See*

6  *Loving and Evans v. Blick*, 33 Cal. 2d 603, 621 (1949).  As a result, a finding that there was no valid

7  contract is not necessarily factually inconsistent with the allegations in the First Amended

8  Complaint.  Accordingly, Marvell's request for summary judgment is DENIED as to Intelligraphics'

9  Quantum Meruit claim.

10  **VII.    LOST PROFITS SUMMARY JUDGMENT MOTION**

11      **A.    Arguments**

12          Intelligraphics seeks summary judgment that Marvell may not recover its lost profits on

13  either its breach of contract counterclaim or its fraud counterclaim.  With respect to Marvell's

14  breach of contract counterclaim, Intelligraphics asserts that lost profits may be awarded only where a

15  party to a contract had reason to know that breach of the contract would result in the lost sales and

16  the undisputed evidence shows that Intelligraphics had no such knowledge here.[10]  Indeed,

17  Intelligraphics' President, Scott Lawson, states in his declaration that throughout the negotiations

18  regarding Amendment 3, Marvell never told him that the work Intelligraphics was to provide to

19  Marvell had to be delivered to Marvell's customers by a particular deadline or Marvell would lose

20  the sale.  *See* Declaration of Scott Lawson in Support of Motion by Intelligraphics that Marvell May

21  not Recover Lost Profits from Lost Sales Pursuant to its Breach of Contract and Fraud

22  Counterclaims (First and Second, Respectively) ("Lawson Motion Decl.").

23          With respect to both the contract and the fraud counterclaims, Intelligraphics asserts that

24  Marvell's evidence is too speculative to support an award of lost profits.  In particular,

25  Intelligraphics asserts that the lost sales of WLAN chips by Marvell that provide the basis for

26  _____

27      [10] In its brief, Intelligraphic's includes both the fraud and the breach of contract counterclaims
in the heading of the section addressing the need for prior notice as a prerequisite for awarding lost
profits.  At oral argument, however, Intelligraphics stipulated that the notice requirement applies only

28  to the breach of contract counterclaim and not to the tort counterclaim.

United States District Court
For the Northern District of California

1    Marvell's special damages claim cannot be determined from the expert report of Marvell's expert,

2    Dan Salah.  That report, Intelligraphics asserts, contains no statistics regarding sales of WLAN chips

3    by other companies, making it impossible to determine with reasonable certainty the amount of lost

4    sales by Marvell, which was new in the field and therefore had no past sales of such chips from

5    which to estimate lost sales.  Further, Intelligraphics asserts, Salah's reliance on Marvell's past sales

6    of Network Interface Cards (NIC) as a basis for determining lost sales is misplaced because the W-

7    LAN technology is different from the NIC.  *See* Lawson Motion Decl., ¶ 8.

8           Finally, Intelligraphics points to evidence it asserts shows that some of the lost sales that

9    Salah attributed to Intelligraphics' breach of contract were, in fact, lost before Intelligraphics had

10   even had a chance to perform and that there was dissatisfaction in the marketplace with Marvell's

11   WLAN chip that was unrelated to the advanced roaming software provided by Intelligraphics.  *See,*

12   *e.g.,* Sommers Motion Decl., Ex. M (Bidichandani Depo.) at ex. 115 (May 30, 2006 email between

13   Marvell employees stating that HP had decided to use Broadcom rather than Marvell); Ex. N

14   (Bidichandani Depo.) at ex.117 (June 16, 2006 email between Marvell employees stating that

15   Lenovo had decided to use Athelos chip rather than Marvell's);   Ex. K (Lenovo report dated May

16   17, 2006 identifying problems with Marvell's chip).

17          In its Opposition, Marvell asserts that Intelligraphics had notice that it would be required to

18   pay special damages if Intelligraphics breached the contract because the SDLA expressly provides

19   for such damages.  In particular, Marvell cites to sections 10 and 7.5 of the SDLA.  Section 10

20   provides as follows:

21          **10.**     <u>**LIMITATIONS OF LIABILITY**</u>

22   

28   SDLA, Section 10.  Section 7.5, in turn, is a warranty that "

**United States District Court**

For the Northern District of California

1 █████████████████████████████████████████████

2 ███████████████████."

3       Further, Marvell cites to evidence, in the form of a series of emails to Intelligraphics, that

4 Marvell asserts should have put Intelligraphics on notice that Marvell needed to deliver to the

5 Custom Software to specific customers and that it was subject to tight delivery schedules as to those

6 deliveries. *See* Declaration of Michael A. Molano in Support of Defendant Marvell Semiconductor,

7 Inc.'s Opposition to Motion by Intelligraphics for Summary Adjudication that Marvell May Not

8 Recover Lost Profits ("Molano Opposition Decl."), Exs. 3-9. On the basis of this evidence, Marvell

9 argues that there are material issues of fact that preclude summary judgment as to Marvell's claim

10 for lost profits on its breach of contract counterclaim.

11       Marvell rejects Intelligraphics' assertion that its expert's report does not provide a

12 reasonable basis from which a jury could determine its lost sales.   It cites to a rebuttal declaration

13 by its expert, Earl Cohen, who states that "while WLAN and NIC cards are 'different' at *lower*

14 *layers* of data transmission standards, these cards are technically similar at *higher layers* and, to an

15 end user who is concerned with connectivity to a network, the cards serve *the exact same purpose*."

16 Declaration of Earl T. Cohen in Support of Defendant Marvell Semiconductor, Inc.'s Opposition to

17 Motion by Intelligraphics for Summary Adjudication that Marvell May Not Recover Lost Profits

18 ("Cohen Opposition Decl."), ¶ 5.  It also points to conflicting evidence regarding the reasons

19 particular sales may have been lost.

20       **B.**    **Analysis**

21           **1.**    **Whether Intelligraphics Had Sufficient Notice of Potential Lost Sales to**
                    **Award Special Damages on Marvell's Breach of Contract Counterclaim**

22

23       California courts follow the rule articulated by the English courts in the seminal case of

24 *Hadley v. Baxendale* (1854) 156 Eng. Rep. 145 regarding the award of consequential damages in

25 contract cases.  Under this rule, "a party assumes the risk of special damages liability for unusual

26 losses arising from special circumstances only if it was advised of the facts concerning special harm

27 which might result from breach –  it is not deemed to have assumed such additional risk, however,

28 simply by entering into the contract." *Lewis Jorge Const. Management, Inc. v. Pomona Unified*

United States District Court

For the Northern District of California

1 | *School Dist.*, 34 Cal.4th 960, 969 (2004)(citations omitted).

2 |      In *Lewis Jorge*, the California Supreme Court set forth the contours of the rule regarding

3 | special damages as follows:

> The *Hadley* rule has long been applied by California courts, which view it as having been
> incorporated into California Civil Code section 3300's definition of the damages available for
> breach of a contract. . . Contract damages, unlike damages in tort (Civ.Code, § 3333), do not
> permit recovery for unanticipated injury. . . . Parties may voluntarily assume the risk of
> liability for unusual losses, but to do so they must be told, at the time the contract is made, of
> any special harm likely to result from a breach . . . Alternatively, the nature of the contract or
> the circumstances in which it is made may compel the inference that the defendant should
> have contemplated the fact that such a loss would be "the probable result" of the defendant's
> breach .. .[the defendant's delay in preparing site for subdivision breached contract with
> developer and subjected the defendant to liability for profits that developer could not earn on
> unbuilt houses].) Not recoverable as special damages are those "beyond the expectations of
> the parties." . . . Special damages for breach of contract are limited to losses that were either
> actually foreseen . . . or were "reasonably foreseeable" when the contract was formed.

11 | *Id.* (citations omitted).

12 |      Here, the question of whether the lost sales Marvell asserts resulted from Intelligraphics'

13 | breach were foreseeable is hotly contested.  On one hand, Intelligraphics cites to the deposition

14 | testimony of its President, Scott Lawson, that Marvell never told Intelligraphics during the

15 | negotiations relating to Amendment 3 that breach of the agreement with respect to any of the

16 | projects that were being developed would lead to lost sales.   Lawson Motion Decl., ¶ 5. Nor do the

17 | emails upon which Marvell relies directly state as much, though they contain various references to

18 | "roadmaps" and "tight timelines."   Molano Opposition Decl., Exs. 6-8.  On the other hand, there is

19 | evidence that the circumstances under which Amendment 3 was negotiated would have (or should

20 | have) made it apparent to Intelligraphics that failure to perform under the contract might lead

21 | Marvell to lost sales.  Indeed, it is undisputed that Intelligraphics understood that the software was

22 | being created for Marvell's customers.  Moreover, the emails to which Marvell cites support the

23 | inference that Marvell believed that it needed to provide the custom software to those customers

24 | within a short period of time.  Therefore, the Court concludes that  there is a factual dispute

25 | regarding the foreseeability of Marvell's lost profits that precludes summary judgment with respect

26 | to the contract claim on this basis.

### 2.        Whether Marvell's Request for Lost Profits is Speculative

28 |      In order to recover lost profits in either tort or contract, both the fact and the amount of lost

United States District Court

For the Northern District of California

1  profits must be proven with "reasonable certainty." *Kids Universe v. In2Labs*, 95 Cal. App. 4th 870,

2  884 (2002).  In cases involving established businesses, lost profits may be establish based on past

3  sales.  *Id.*  Where the business is not established, lost profits may be proven in a "variety of ways,"

4  as the court in *Kids Universe* explained:

> Restatement Second of Contracts, section 352, comment b, at page 146 provides, "[I]f the business is a new one or if it is a speculative one ..., damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like." Similarly, the Restatement Second of Torts, section 912, comment d at page 483 states, "When the tortfeasor has prevented the beginning of a new business ... all factors relevant to the likelihood of the success or lack of success of the business or transaction that are reasonably provable are to be considered, including general business conditions and the degree of success of similar enterprises."

> Our Courts of Appeal have held, consistent with the Restatement Second of Torts, that the experience of similar businesses is one way to prove prospective profits. . . .  Also relevant is whether the market is an established one.

12  *Id.* at 884-885.

13  Here, Intelligraphics argues that it is entitled to summary judgment as to Marvell's request

14  for lost profits damages because Marvell has not presented any evidence concerning the sales of

15  WLAN cards by other companies and therefore, its estimates of lost sales are speculative. The Court

16  disagrees.  Marvell's expert has provided an analysis of its lost sales based on Marvell's past sales of

17  the NIC card.  *See* Sommers Opposition Decl., Ex. V (Salah Expert Report).  That analysis

18  concludes that the NIC sales provide a reasonable basis for estimating lost sales because they were

19  sold to the same customers, used to connect computers to a Local Area Network, have a similar sales

20  process and sales cycle and have a similar chain of commerce.  *Id.* at ¶ 34  Further, although

21  Intelligraphics' president states in his declaration that NIC cards are different from WLAN cards and

22  therefore cannot be used to calculate lost profits as to Marvell's lost sales, Marvell's expert, Earl

23  Cohen, states that the two are in many ways the same.  In light of the conflicting evidence, the Court

24  cannot say, as a matter of law, that Marvell will be unable to prove its lost sales with reasonable

25  certainty at trial.  Accordingly, the Court concludes that Intelligraphics is not entitled to summary

26  judgment as to Marvell's lost profits on the grounds that they are speculative.

27  **IV.    CONCLUSION**

28  For the reasons stated above, the Court rules as follows on the parties' summary judgment

United States District Court

For the Northern District of California

motions:

1.     Marvell's Fraudulent Inducement Summary Judgment Motion: GRANTED.  Claim 3, for fraudulent inducement is dismissed with prejudice.

2.     Marvell's Copyright Summary Judgment Motion: GRANTED.  Claim 6, for copyright infringement, is dismissed with prejudice.

3.     Marvell's Fraud/Quantum Meruit Summary Judgment Motion: GRANTED in part, DENIED in part.  Claim 4, for fraud, is dismissed with prejudice.  Intelligraphics will be permitted to present Claim 7, for quantum meruit, to the jury at trial.

4.     Intelligrahics' Lost Profits Summary Judgment Motion: DENIED.  Marvell shall be permitted to present evidence of lost profits to the jury at trial.

IT IS SO ORDERED.

Dated: January 28, 2009

_____
JOSEPH C. SPERO
United States Magistrate Judge

31